[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-17134
Non-Argument Calendar
_____

D.C. Docket No. 8:14-cv-02867-SDM-AEP


DAVID CARR,

Plaintiff-Appellant,

versus

JOHN HANCOCK LIFE INSURANCE COMPANY (USA),

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 12, 2017)

Before HULL, JULIE CARNES, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Plaintiff-appellant David Carr appeals pro se from the district court's grant of summary judgment in favor of defendant-appellee John Hancock Life Insurance Company ("John Hancock") on his claim for wrongful denial of benefits under the Employee Retirement Income Security Act ("ERISA").  Carr contends that the district court erred by determining that John Hancock was "not wrong" in terminating Carr's benefits under its long-term care insurance policy effective July 2013.  After careful review of the record and the parties' briefs, we affirm.

## I.  FACTUAL BACKGROUND

### A.    The John Hancock Plan and Policy

Carr worked for Shell Oil Company and participates in Shell Oil Company's pension and welfare-benefits plan (the "Plan"), which is governed by ERISA.  As part of the Plan, John Hancock issued a Group Long-Term Care Policy to Shell Oil Company (the "Policy").  Carr is insured under the Policy.

To be eligible for benefits under the Policy, an insured must be "[c]hronically [i]ll."  This means that the insured must be "unable to perform at least two Activities of Daily Living due to the loss of functional capacity for a period expected to last 90 days."[1]  Similarly, the Policy defines "Benefit Trigger" as being "unable to perform (without Substantial Assistance from another

---

[1]The Policy also contains a cognitive-impairment provision, but Carr never claimed that he was cognitively impaired, and he admits on appeal that this provision does not apply.

2

individual) at least 2 Activities of Daily Living for a period of at least 90 days due to a loss of functional capacity."

The Policy delineates six Activities of Daily Living ("ADLs"): (1) Bathing (defined as washing oneself in either a tub or shower, including the task of getting into and out of the tub or shower); (2) Continence (meaning the ability to maintain control of bowel or bladder function and the ability to perform associated personal hygiene); (3) Dressing (defined as putting on and taking off all items of clothing and any necessary braces, fasteners, or artificial limbs); (4) Eating (defined as feeding oneself by getting food into the body from a receptacle such as plate, cup or table or by a feeding tube or intravenously); (5) Toileting (defined as getting to and from the toilet, getting on and off the toilet, and performing associated personal hygiene); and (6) Transferring (defined as moving into or out of a bed, chair or wheelchair, or moving from place to place either via walking or wheelchair or other means).

"Substantial Assistance" means "[s]tand-by or hands-on assistance by another person needed to perform the Activity of Daily Living."  "Stand-by" assistance means the presence of another person nearby who can prevent injury as the insured performs the ADL himself, while "hands-on" assistance means the physical assistance of another person, without which the insured could not perform the ADL.

3

The Policy provides that John Hancock will "only pay benefits if" it is provided with "Proof of Claim satisfactory to Us that confirms that You are receiving covered services and You continue to meet all eligibility requirements."

**B.      Carr Was Paid Benefits from July 7, 2011 until July 19, 2013**

According to Carr's filings in the district court, by January 2011, he was legally blind and had been diagnosed with muscle atrophy, peripheral neuropathy, anemia, fatty liver, tobacco abuse, anxiety and depression, prostate cancer, and hypertension.  The parties agree that Carr filed a claim for benefits under the Policy in May 2011, and that John Hancock determined that Carr met the requirements for payment of benefits from July 7, 2011 until July 19, 2013.

**C.      The February 2012 On-Site Assessment**

In February 2012, John Hancock ordered what it characterizes as an "independent on-site assessment" of Carr's condition.  The assessment was performed by a registered nurse for Univita.  The Univita nurse reported that Carr was "intoxicated and not feeling well" during her visit.  Carr told the nurse that he had been drinking for three weeks and had not bathed in three weeks.  The nurse reported that Carr needed assistance (either stand-by or hands-on) in all of the listed ADLs except for eating.

Beginning in April 2012, a nurse employed by Maxim Healthcare Services ("Maxim") provided Carr with home health care services.  According to "weekly

4

notes" completed by Maxim between April 2012 and February 2013, the Maxim

home health care nurse typically assisted Carr with housekeeping, meals, and two

ADLs—bathing and transferring.[2]  The Maxim home health care nurse and Carr

reviewed and signed each weekly note.

### D.    The February 2013 On-Site Assessment

In February 2013, John Hancock ordered another on-site assessment of Carr

by Univita.  The report from the February 2013 assessment stated that Carr

received home health services because he was "unstable on [his] walker, blind,

[and] weak."  The report also stated that Carr worked out three times a week on his

home gym.  As to Carr's functional capacity, the Univita nurse concluded that Carr

needed assistance with bathing, toileting, transferring, and "rare" bowel

incontinence.  The Univita nurse noted that, although Carr struggled with his

balance and strength, his mobility had improved to the point that he could use a

walker.  Accordingly, John Hancock approved Carr for further benefits.

### E.    Documentation from May 2013 to August 2013

According to the Maxim weekly notes from May to mid-June 2013, the

Maxim home health care nurse typically assisted Carr with only showering,

housekeeping, and meal preparation.  In mid-June 2013, the Maxim home health

care nurse assisting Carr stopped working for Maxim and began working as an

---

[2]The weekly notes from March and April 2013 were similar.

"independent care provider" to Carr.  Thus, she began submitting "independent care provider service bills" (the "ICP bills") to John Hancock.  Again, both the home health care nurse and Carr reviewed and signed the ICP bills, certifying that the information provided therein "is a complete and accurate representation of the care provided and received."

According to those ICP bills, no ADLs were checked off from June 16, 2013 to August 10, 2013.  However, beginning on August 11, 2013, and continuing through at least November 22, 2014, the ICP bills began checking off all, or nearly all, of the six ADLs every day.

## F.    The July 2013 On-Site Assessment

In July 2013, John Hancock ordered another on-site assessment of Carr by Univita.  The Univita nurse stated that Carr did not need any assistance with eating, transferring, toileting, bathing, continence, or dressing.  The Univita nurse noted that he walked with a "steady gait" and "erect posture" while using his walker, could get in and out of a chair by himself, could bathe himself while seated in a shower seat, and could dress himself.  Further, the nurse's report states that Carr told her he was "very pleased" with his recent gains in mobility.  The Univita nurse also reported that she saw Carr walk with the aid of his walker, and that Carr used his Bowflex exercise machine "regularly."

6

## G.    John Hancock Terminated Carr's Benefits Effective July 18, 2013

John Hancock terminated Carr's benefits under the Policy effective July 18, 2013 because he "no longer [met] the benefit eligibility criteria of [his] certificate of insurance."  In a letter dated August 5, 2013, John Hancock notified Carr of his claim denial.  In that August 5 letter, John Hancock explained that, based on the July 2013 on-site assessment, Carr was no longer dependent in any ADL and "[t]he clinical evidence does not support that ongoing assistance or supervision by another person is required in order to take care of [yourself]."  John Hancock also informed Carr that he was permitted to request reconsideration of the denial and, if he were to do so, he could "submit any additional information that you feel may help clarify matters."[3]

## H.    Carr Files Multiple Administrative Appeals

Carr timely requested reconsideration of John Hancock's July 18, 2013 claim denial and submitted additional documentation.  As part of the request for reconsideration, Carr's attorneys sent 700 pages of medical records.  For example, Carr submitted office notes from Dr. Barry Sadler and lab results and office visit notes from Suncoast Urology and Cancer Care Center of Florida ("Suncoast").

On January 29, 2014, following a review of the additional records provided by Carr, John Hancock sent Carr a letter standing by its initial July 18, 2013 denial

---

[3]After the July 2013 denial of benefits, Carr continued to pay out of pocket for the services of his home health care aid.

of further benefits.  This letter provided a more fulsome explanation of John Hancock's denial of benefits, explaining that the July 2013 on-site assessment "identified that [Carr] did not require assistance" in any of the six ADLs and pointed out that, that during the assessment, Carr stated that he was "very pleased with [his] recent gains with gait stability and balance and that [he] was using a Bowflex workout machine regularly."  The January 29, 2014 letter also explained that John Hancock had reviewed the weekly notes submitted by Maxim from April 2012 to April 2013, which demonstrated that Carr required assistance with showering, transferring, and occasionally ambulation.  But the weekly notes from May 2013 to June 15, 2013 indicated that he was receiving assistance only with showering.  Further, "[i]t appears from the notes of care during this time period that the majority of the care was housekeeping in nature."

John Hancock also reviewed the ICP bills submitted by Carr's nurse from June 16, 2013 through January 2014.  It noted that "[n]o ADL activity tasks were checked off" from June 16, 2013 to August 10, 2013.  But after August 10, 2013, "every ADL activity was checked off showing a very abrupt and drastic decline in functional independence that is indicated in no other medical documentation associated with the claim."  John Hancock noted Carr's submissions from Dr. Sadler and Suncoast, but stated that these documents did not address Carr's

8

functional ability or ADL limitations and, therefore, had "no bearing on the claim denial."

Carr appealed the claim denial in February 2014 and, in the months following, submitted additional records from several doctors. Included with that additional documentation was a "Certification of Chronically Ill Individual" (the "Certification") completed and signed by Carr's neurologist, Dr. Subramanian, on May 15, 2014. In his Certification, Dr. Subramanian stated that Carr was unable to perform dressing, bathing, transferring, toileting, and continence without substantial assistance from another person.[4]

In a letter dated June 13, 2014, John Hancock informed Carr that John Hancock's long-term care claims appeal committee (the "Committee") had denied his appeal and upheld the July 18, 2013 denial of his claim. In addition to the reasons given in the January 29, 2014 letter, the Committee explained that, after it reviewed Dr. Subramanian's May 15, 2014 Certification, it then requested additional medical records from Dr. Subramanian. Those records contained a note from Dr. Subramanian dated April 17, 2014 stating that Carr "can eat, bathe, use the toilet, dress, and get up from the chair or bed." The Committee explained that Carr was permitted to appeal the Committee's decision.

---

[4]Carr also submitted medical records from Dr. Choksi and Dr. Sullivan, which appear to be lab results and office notes from various visits and do not speak to Carr's functional capacity in and around July 2013.

9

Carr once again appealed and submitted additional documentation, including a "Certification of Chronically Ill Individual," signed by Dr. Sadler on August 26, 2014.

In a letter dated October 2, 2014, John Hancock denied Carr's appeal. The October 2 letter stated that Carr's medical records that it had obtained from Dr. Sadler "do not support that you require assistance to perform bathing, toileting and continence which is contained on the Certification of Chronically Ill Individual signed by Dr. Sadler." John Hancock informed Carr that this affirmance of his appeal "is a final plan administration decision and exhausts your administrative remedies under the plan."

## II. PROCEDURAL HISTORY

In December 2014, Carr, through counsel, filed an amended complaint against John Hancock seeking to "recover benefits, enforce rights and clarify future rights to benefits" under ERISA, 29 U.S.C. § 1132(a)(1)(B).[5] Carr claimed that John Hancock's July 2013 denial of benefits under the Policy violated ERISA. This lawsuit concerns only the denial of benefits from July 18, 2013 until July 9, 2014.[6]

---

[5]Carr's amended complaint also included a count for breach of fiduciary duty under ERISA. This count was later dismissed by joint stipulation.

[6]As discussed below, Carr filed a new claim for benefits under the Policy in April 2015. In September 2015, John Hancock approved this claim "effective July 9, 2014."

In September 2015, John Hancock filed a motion for summary judgment, arguing that its decision to deny Carr further benefits as of July 18, 2013 was correct. Alternatively, John Hancock argued that, under the applicable "arbitrary and capricious" standard of review, its July 2013 denial of Carr's benefits claim was reasonable and should be upheld.

Through counsel, Carr responded in opposition. But in April 2016, Carr fired his attorneys and elected to proceed pro se. Carr then began filing numerous "notices" and "motions" with the district court. In his pro se filings, Carr informed the district court that, in April 2015, he filed a claim with John Hancock for benefits under the Policy, and John Hancock had deemed him eligible for benefits under the Policy as of July 9, 2014.[7]

John Hancock moved to strike Carr's pro se filings and urged that all of them be struck as untimely and containing information outside the administrative record. The record shows that, on July 24, 2015, John Hancock wrote to Carr's attorney informing him that (1) the April 2015 claim would be treated as a "new claim" separate and apart from the claim at issue in this litigation and (2) with respect to the claim at issue in the instant litigation, "the administrative record is

---

[7]The record does not explicitly state whether Carr is continuing to receive benefits under the Policy, although Carr states in his pro se brief on appeal that, as of July 9, 2014, he was determined to be "'qualified' and 'benefit eligible' going forward to date."

11

closed [and] will not be affected by the review and determination of entitlement to benefits under the new claim."

On October 17, 2016, the district court granted John Hancock's motion for summary judgment. The district court first determined that, under this Court's precedent, it must review Carr's ERISA benefits claim under a multi-step framework. The first step in this framework requires the district court, on de novo review, to determine whether the claim administrator's decision was "wrong." Moving under this prong, the district court determined that John Hancock "correctly denied Carr's claim." The district court pointed out that the July 2013 on-site assessment found that Carr could perform all six ADLs without substantial assistance, and this assessment matched up with the weekly notes and ICP bills, which confirmed that Carr required assistance with one or zero ADLs from May to August 2013. Thus, the district court determined that Carr had not met his burden of proving that, as of July 2013, he met the eligibility standards set forth in the Policy.

The district court rejected Carr's reliance on other documents in the administrative record, such as Dr. Subramanian's May 2014 Certification, as "inconsistent not only with the July 2013 assessment, the weekly notes, and the provider bills, but also with the neurologist's own notes." Thus, John Hancock was within its discretion to afford these documents little weight. The district court

12

also noted that the "relevant time for assessment of [Carr's] condition" was July 2013, and many of the records submitted by Carr were not relevant to that time period.  Accordingly, because the district court would have reached the same decision as the claims administrator, the district court granted summary judgment in favor of John Hancock and directed the clerk to "terminate any pending motion."

Carr, acting pro se, timely appealed to our Court.

### III.  STANDARD OF REVIEW

This Court reviews de novo "a district court's ruling affirming or reversing a plan administrator's ERISA benefits decision, applying the same legal standards that governed the district court's decision."  Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011).

As this Court has recognized, ERISA itself does not provide a standard for courts reviewing the benefits decisions of plan administrators.  Id.  The United States Supreme Court has determined that, where an ERISA plan administrator has discretionary authority to interpret a plan, courts should apply a deferential, "arbitrary and capricious" standard of review.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109-11, 109 S. Ct. 948, 953-54 (1989); see also Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1355-56 (11th Cir. 2008).  The Supreme Court later expanded the Firestone approach and held that, when the

terms of a plan grant discretionary authority to the plan administrator, a deferential

standard of review continues to apply even in the face of a conflict of interest.

Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115-18, 128 S. Ct. 2343, 2350-52

(2008).

Relying on the Supreme Court's guidance in Firestone and Glenn, this Court

has developed a "multi-step framework to guide courts in reviewing an ERISA

plan administrator's benefits decisions."  Blankenship, 644 F.3d at 1354 (citing

Williams v. Bellsouth Telecomms., Inc., 373 F.3d 1132, 1137-38 (11th Cir. 2004),

overruled on other grounds by Doyle, 542 F.3d at 1360-63).  Thus, courts

reviewing a plan administrator's benefits decision under ERISA will follow this

six-part Williams test:

> (1) Apply the de novo standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (i.e., the court
> disagrees with the administrator's decision); if it is not, then end the
> inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then
> determine whether he was vested with discretion in reviewing claims;
> if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was
> vested with discretion in reviewing claims, then determine whether
> "reasonable" grounds supported it (hence, review his decision under
> the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse
> the administrator's decision; if reasonable grounds do exist, then
> determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship, 644 F.3d at 1355.

"Whether the plan administrator's decision was either de novo correct or reasonable under this Circuit's Williams framework is a question of law." Id. at 1354.  Additionally, "[r]eview of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." Id.

Under ERISA's civil enforcement provisions, a plan participant may bring a civil action against the plan administrator to recover wrongfully denied benefits due under the terms of the plan.  29 U.S.C. § 1132(a)(1).  In such cases, the insured bears the burden of proving that he is disabled.  Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1247 (11th Cir. 2008).

## IV.  DISCUSSION

Before we can examine the merits of this appeal, we first must grapple with these antecedent questions:  (1) what is the appropriate standard of review; (2) what record evidence should the district court properly have taken into account in rendering its decision; and (3) who had the burden of proof.  We address each in turn.

## A.    The District Court Utilized the Correct Standard

The parties do not dispute that the Plan and Policy confer discretion on John Hancock in adjudicating claims.  Further, the Policy issued by John Hancock provides that the claimant for benefits must submit "Proof of Claim satisfactory to Us."  See Tippitt v. Reliance Standard Life Ins. Co., 457 F.3d 1227, 1233-34 (11th Cir. 2006) (holding that similar language conferred discretion on the plan administrator).

Contrary to Carr's argument on appeal, the district court set forth the correct standard for its review of John Hancock's discretionary benefits decision—the Williams framework.  While this Court has noted the "discongruence" between the typical summary judgment standard and the arbitrary-and-capricious standard utilized in ERISA cases, it is perfectly clear from this Court's precedent that, where an ERISA plan administrator has discretionary authority to interpret a plan, courts apply a deferential "arbitrary and capricious" standard of review.  See Blankenship, 644 F.3d at 1354 & n.4; Doyle, 542 F.3d at 1355-56.

## B.    The Administrative Record Was Closed as of October 2, 2014

While not explicitly stated, it is clear from the district court's order that it did not take the information regarding Carr's April 2015 claim into account when making its determination.  This was correct because "[r]eview of the plan

16

administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." Blankenship, 644 F.3d at 1354. The only information that may be properly taken into account when assessing Carr's current claim is the information that John Hancock had as of October 2, 2014, when it informed Carr of its final denial of his claim and closed the matter. The new claim, filed in April 2015, falls outside of this window and neither we nor the district court may properly consider it.

## C.    Carr Bore the Burden of Proving His Entitlement to Benefits

The Policy specifically provided that John Hancock will "only pay benefits if" it is provided with "Proof of Claim satisfactory to Us that confirms that You are receiving Covered Services and You continue to meet all eligibility requirements." Therefore, the Policy places the onus squarely on the insured to provide "proof" that he or she meets the eligibility requirements. Further, we have held that an ERISA plaintiff (the insured) bears the burden of proving that he is disabled. Glazer, 524 F.3d at 1247. Thus, Carr bore the burden of proving his entitlement to benefits under the Policy.

With these preliminary rules in mind, we now turn to determining whether a reasonable basis existed for John Hancock's benefits decision. See Blankenship, 644 F.3d at 1354.

17

### D.    John Hancock's Decision to Deny Benefits was Correct

Turning to the first step in the <u>Williams</u> framework, we must ask whether the claim administrator's benefits-denial decision was "wrong" (i.e., whether we agree with the administrator's decision).  <u>Blankenship</u>, 644 F.3d at 1355; <u>see also</u> <u>Tippitt</u>, 457 F.3d at 1232 ("'Wrong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms <u>de novo,</u> the court disagrees with the claims administrator's plan interpretation.").

Under the administrative record before us, we agree with John Hancock's decision to deny Carr's claim for further benefits as of July 18, 2013.  To remain eligible for benefits under the Policy, Carr had to demonstrate that he was unable to perform at least two ADLs without substantial assistance from another individual for a period of at least 90 days due to a loss of functional capacity.  The July 2013 on-site assessment, which was performed by an independent company, found that Carr did not need assistance to perform <u>any</u> ADLs, and this was corroborated by the weekly notes and ICP bills from May to August 2013, which showed that Carr needed assistance with, at most, one ADL.  In fact, the weekly notes showed that, during that May to August 2013 timeframe, the majority of the caregiver's time was spent doing housework and preparing meals, neither of which

18

is a listed ADL.  Thus, under the plain terms of the Policy, Carr was no longer eligible for benefits as of July 18, 2013.

Carr's argument that John Hancock wrongly discounted his own doctors' opinions is unavailing.  Carr does not indicate on appeal which medical records or physician opinions would sufficiently rebut this evidence.  While the record contains two "Certification[s] of Chronically Ill Individual" from Dr. Subramanian and Dr. Sadler, these Certifications are in conflict with the July 2013 on-site assessment, the weekly notes, and the ICP bills, all of which indicate that Carr did not require substantial assistance with any more than one ADL from May to mid-August 2013.  And Dr. Subramanian's Certification is in direct conflict with his own notes from a visit just one month prior to the Certification.  Thus, John Hancock could, in its discretion, afford this evidence little weight.  See Blankenship, 644 F.3d at 1356 (explaining that plan administrators "may give different weight to [certain doctors'] opinions without acting arbitrarily and capriciously" and "need not accord extra respect to the opinions of the claimant's treating physicians," especially where other evidence in the record could have led the plan administrator to "doubt" the proffered opinions).

Carr's other arguments are equally meritless.  While Carr implies that John Hancock cut off his benefits in retaliation for switching from a Maxim nurse to an independent healthcare provider, there is no support in the record for that

allegation.  Nor is there any support for Carr's allegation that John Hancock told the Univita nurse who conducted the July 2013 on-site assessment that, if she did not find that the insured met the eligibility criteria in two or more ADLs, she should report none.  Carr, who has the burden of proof in this case, has pointed us to no record evidence to support either of these allegations.[8]

### E.    Even If It Was Not Correct, John Hancock's Decision Was Reasonable

Given our determination that John Hancock was correct in its decision to deny Carr further benefits as of July 18, 2013, our inquiry can end and we need go no further.  See Blankenship, 644 F.3d at 1355.  However, as an alternative and independent ground, we conclude that, even assuming arguendo that John Hancock's claims-denial decision was "de novo wrong," the district court still properly granted John Hancock relief because that decision was reasonable under a deferential "arbitrary and capricious" standard of review.

Under step two of the Williams framework, it is not disputed that the Plan and Policy vested John Hancock with discretion in reviewing claims.  See Blankenship, 644 F.3d at 1355.  We must then ask, using an arbitrary and capricious standard, whether "reasonable" grounds supported the decision.  Id.

---

[8]For the first time on appeal, Carr raises several arguments, including arguments regarding his various disputes with counsel and his contention that his nurse simply did not know how to properly fill out the required forms, such that the failure to list assistance with any ADLs was merely "confusion" over a "reporting" issue.  Because Carr failed to raise these arguments below, this Court will not consider them.  See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004).

For all of the reasons given above, we conclude that John Hancock's July 2013 denial of benefits was a reasonable decision. That leaves the final question of whether John Hancock operated under a conflict of interest. See id.

Carr argues that John Hancock operated under a structural conflict of interest as the plan administrator who both makes eligibility determinations and pays benefits. This Court has squarely held that such a conflict does not, on its own, render a benefits decision arbitrary and capricious. Id. at 1355-56. Rather, it is "'a factor' in the analysis: but the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision." Id. at 1355.

Carr has provided nothing to demonstrate that the conflict of interest here has "sufficient 'inherent or case-specific importance'" to overturn the decision. See id. at 1357 (noting that it is the plaintiff's burden to show that a decision was arbitrary and capricious). As in Blankenship, we "see no persuasive indication in the record that, in this specific case, [John Hancock] was improperly motivated by short-term gain in denying [Carr's] long-term disability benefits claims. . . . Nor do we see persuasive evidence in the record of procedural unreasonableness in [John Hancock's] handling and review of [Carr's] claims." Id. at 1357.

## V.  CONCLUSION

For all of the foregoing reasons, we affirm the district court's decision granting summary judgment in favor of John Hancock on Carr's ERISA claim for denial of benefits from July 18, 2013 until July 9, 2014.

**AFFIRMED.**