[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-10717

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2011
JOHN LEY
CLERK

D.C. Docket No. 2:08-cv-00639-WMA

FRANK BLANKENSHIP,

Plaintiff - Appellee,

versus

METROPOLITAN LIFE INSURANCE COMPANY,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 30, 2011)

Before EDMONDSON, MARTIN and COX, Circuit Judges.

PER CURIAM:

In this appeal, Plaintiff Frank Blankenship challenges the denial by Defendant Metropolitan Life Insurance Company ("MetLife") of his claims for long-term disability benefits. In reviewing those benefits decisions by MetLife, the ERISA plan administrator, we consider whether the decisions were reasonable and entitled to deference. Pointing chiefly to MetLife's structural conflict of interest as both administrator and payor of benefits, the district court ruled that MetLife arbitrarily and capriciously denied Blankenship's benefits requests. We conclude that a reasonable basis supported MetLife's benefits decisions and that the conflict of interest did not render the decisions arbitrary and capricious; we reverse.

## I.

Frank Blankenship worked for Sears, Roebuck & Co. as a store manager and participated in the Sears Group Long-Term Disability Plan ("the Plan"). The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. Defendant MetLife serves as both the Plan's administrator of claims and also the payor of benefits. The Plan vests MetLife

2

with discretionary authority to interpret the Plan's terms and to determine whether a claimant is disabled under the Plan.

Blankenship suffered a heart attack in August 2003 while playing tennis. Based on his heart attack, MetLife provided Blankenship with short-term disability benefits until mid-January 2004 and then provided Blankenship with long-term disability benefits for the remainder of 2004. After requesting and receiving medical records from Blankenship to evaluate his benefits claim, MetLife notified Blankenship, in December 2004, that his disability benefits would end on 31 December 2004.[1]

Blankenship appealed the decision and submitted letters from his internist and cardiologist stating that Blankenship could not return to work due to stress. MetLife reviewed those letters, and MetLife submitted Blankenship's file to an independent cardiologist for review. MetLife denied Blankenship's appeal.

In February 2005, Blankenship underwent surgery to repair a knee injury that he suffered while exercising. In April 2005, MetLife reinstated Blankenship's long-term disability benefits through May 2005, based on the knee surgery and on

---

[1] During the time that Blankenship was receiving long-term disability benefits from MetLife, Blankenship applied for, and was denied, Social Security Disability Income ("SSDI") benefits from the Social Security Administration.

Blankenship's expected rehabilitation period. MetLife then informed Blankenship that his eligibility for long-term disability benefits would end in January 2006 unless Blankenship could show that he was eligible for benefits under the Plan's "Any Occupation" standard.[2]

In conjunction with its continued review of Blankenship's case, MetLife considered a report from an independent vocational rehabilitation consultant hired by MetLife. MetLife had provided the consultant with, among other files, a report from Blankenship's orthopedic surgeon. The consultant concluded that Blankenship could not stand for more than three-to-four hours or walk for more than one-to-two hours each work day. But the consultant also concluded that Blankenship could perform sedentary work, and the consultant identified several occupations in which Blankenship could be employed in the local market. MetLife determined that Blankenship was fit to perform a sedentary occupation and that he did not qualify for benefits under the Plan's "Any Occupation" standard.

---

[2] The Plan has two methods for determining eligibility for benefits. First, under the "Own Occupation" standard, a claimant is disabled during the first two years after a claim is made if, due to sickness or accidental injury, he is unable to earn more than 80% of his pre-disability earnings by performing the duties of his occupation for any local employer. Second, after the first two years, under the "Any Occupation" standard, a claimant is disabled if, due to sickness or accidental injury, he is unable to earn more than 60% of his pre-disability earnings by performing any gainful occupation for which he is reasonably qualified for any local employer.

MetLife informed Blankenship that his eligibility for long-term disability benefits would end in January 2006. Blankenship appealed that decision. In further reviewing Blankenship's case, MetLife requested review of Blankenship's file by three different specialists: a cardiologist, a dermatologist, and an orthopedist. MetLife then denied the appeal, informing Blankenship that he had exhausted his appeals.[3]

In April 2008, Blankenship filed a complaint against MetLife in the district court to recover long-term disability benefits under ERISA, 29 U.S.C. § 1132(a)(1)(b). The district court granted, in part, Blankenship's motion for a judgment as a matter of law; the motion sought an award of long-term disability benefits under the Plan, subject to any pertinent SSDI offsets. Blankenship v. Metro. Life Ins. Co., 686 F. Supp. 2d 1227, 1228-29 (N.D. Ala. 2009). The district court concluded that MetLife's decisions to deny benefits were arbitrary and capricious, chiefly because of MetLife's structural conflict of interest as both administrator and payor of the pertinent benefits. See id. at 1234-39.

---

[3] In July 2007, the Social Security Administration reversed its earlier denial and concluded that Blankenship had become fully disabled beginning in August 2003, the date of Blankenship's heart attack. That decision was based both on Blankenship's heart condition and on his knee injury; Blankenship received approximately $84,000 in benefits.

The district court later issued a short amendment to its opinion after this Court decided Capone v. Aetna Life Insurance Company. 592 F.3d 1189 (11th Cir. 2010). In the amendment, the district court listed and answered -- without elaboration -- the six steps of the Williams test for reviewing an ERISA plan administrator's benefits decision. Although the district court did not expressly apply the Williams test in its initial opinion, the district court stated that "in finding that MetLife abused its discretion when it denied benefits, the court was implicitly finding that MetLife was de novo 'wrong.'" In its amendment, the district court "ma[de] explicit now" that conclusion. The amendment to the opinion did not alter the judgement entered earlier. MetLife appeals.

II.

This case calls upon us to determine whether a reasonable basis existed for the ERISA plan administrator's benefits decisions. We review de novo a district court's ruling affirming or reversing a plan administrator's ERISA benefits decision, applying the same legal standards that governed the district court's decision. Cf. Capone, 592 F.3d at 1194. Review of the plan administrator's denial of benefits is limited to consideration of the material available to the

6

administrator at the time it made its decision.  See Jett v. Blue Cross & Blue

Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989).  Whether the

administrator's decision was either de novo correct or reasonable under this

Circuit's Williams framework is a question of law.[4]

ERISA itself provides no standard for courts reviewing the benefits

decisions of plan administrators or fiduciaries.  Firestone Tire & Rubber Co. v.

Bruch, 109 S. Ct. 948, 953 (1989).  As a result, and based on the Supreme Court's

guidance in Firestone and Glenn, see Metro. Life Ins. Co. v. Glenn, 128 S. Ct.

2343, 2348 (2008), we have established a multi-step framework to guide courts in

reviewing an ERISA plan administrator's benefits decisions.  The first five steps

have remained unchanged since we established the framework in Williams.  See

Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1137-38 (11th Cir. 2004),

overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston, 542

F.3d 1352 (11th Cir. 2008).  But the sixth step listed below reflects a more recent

change based on Glenn.  See 128 S. Ct. at 2351; Doyle, 542 F.3d at 1359-60

---

[4] In this case, we review the district court's ruling on what the parties termed "motion[s] for judgment as a matter of law."  The parties and the district court treated these motions as vehicles for resolving conclusively -- in the light of the record before the plan administrator -- the question of the reasonableness of the administrative determinations in this case.  For background, see Leahy v. Raytheon Co., 315 F.3d 11, 16-18 (1st Cir. 2002) (discussing the "discongruence" between the usual summary-judgment standard and the arbitrary-and-capricious standard for ERISA cases).

(modifying the sixth step's "heightened" review and shifting the burden of proof about the influence of a conflict of interest from the administrator to the prospective beneficiary).

For a court reviewing a plan administrator's benefits decision, the present Williams test goes this way:

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

See Capone, 592 F.3d at 1195.[5]

A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds. See Glenn, 128 S. Ct. at 2348. Where a conflict exists and a court must reach step six, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Doyle, 542 F.3d at 1360. The effect that a conflict of interest will have within the Williams analysis in any given case will vary according to the severity of the

---

[5] In ERISA cases, the phrases "arbitrary and capricious" and "abuse of discretion" are used interchangeably. See Jett, 890 F.2d at 1139.

9

conflict and the nature of the case: we look to the conflict's "inherent or case-specific importance." Glenn, 128 S. Ct. at 2351-52.

Even where a conflict of interest exists, courts still "owe deference" to the plan administrator's "discretionary decision-making" as a whole.[6] Doyle, 542 F.3d at 1363; see also Glenn, 128 S. Ct. at 2353 (Roberts, C.J., concurring in part and concurring in the judgment) (noting the "deference owed to plan administrators when the plan vests discretion in them").

Courts must account for a structural conflict of interest, when one exists, as "a factor" in the analysis: but the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision. See Conkright v. Frommert, 130 S. Ct. 1640, 1651 (2010) ("[T]he plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'") (quoting Firestone, 109 S. Ct. at 954); White v. Coca-Cola Co., 542 F.3d 848, 856 (11th Cir. 2008) ("'As long as a reasonable basis appears for [the plan administrator's] decision . . . , it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision.'") (quoting Jett, 890 F.2d at 1140). The presence of a structural conflict of interest -- an unremarkable fact in

---

[6] The deference is due both for the administrator's plan interpretations and for his factual determinations. See, e.g., Torres v. Pittston Co., 346 F.3d 1324, 1326 (11th Cir. 2003).

10

today's marketplace -- constitutes no license, in itself, for a court to enforce its

own preferred de novo ruling about a benefits decision. See Glenn, 128 S. Ct. at

2353 ("The conflict of interest . . . is a common feature of ERISA plans.")

(Roberts, C.J., concurring in part and concurring in the judgment).


### III.


Based on the administrative record in this case, we conclude that the plan

administrator possessed a reasonable basis for its benefits decisions and that

MetLife's conflict of interest did not render those decisions arbitrary and

capricious.[7] Therefore, the courts must accept MetLife's benefits decisions in this

case.


### A.


MetLife's benefits decisions in this case were reasonable. The Plan in this

case placed the burden on Blankenship to "provide conclusive medical evidence of

---

[7] That the plan administrator in this case had discretion in reviewing claims under the Plan is undisputed: thus, all of the steps in the Williams test are potentially at issue.

11

Disability" under the Plan. MetLife considered the medical information submitted by Blankenship's doctors and relied upon the advice of several independent medical professionals to conclude that Blankenship had failed to make a sufficient showing of disability under the Plan.

Even where Blankenship's own doctors offered different medical opinions than MetLife's independent doctors, the plan administrator may give different weight to those opinions without acting arbitrarily and capriciously. See Slomcenski v. Citibank, N.A., 432 F.3d 1271, 1279-80 (11th Cir. 2005) (citing Black & Decker Disability Plan v. Nord, 123 S. Ct. 1965, 1970-72 (2003)). Plan administrators need not accord extra respect to the opinions of a claimant's treating physicians. Nord, 123 S. Ct. at 1970. We see nothing in the record that would lead us to conclude that MetLife did not act reasonably in relying on the independent medical opinions or in crediting those opinions over the opinions of Blankenship's doctors.

In addition, evidence existed in the record that could have led MetLife, with reason, to doubt some of the medical opinions offered by Blankenship's treating physicians. For example, in January 2005, Blankenship's main cardiologist informed MetLife by letter that physical exercise caused Blankenship chest pain and that Blankenship required nitroglycerin for relief. Less than two months later,

the same cardiologist told Blankenship's orthopedic surgeon by letter that Blankenship had intermittent, "very mild" chest pain that had not required nitroglycerin. The cardiologist also opined to the orthopedic surgeon that Blankenship showed only "insignificant coronary artery disease."

Given these possibly conflicting reports and the absence of persuasive evidence that MetLife conducted an unfair review of Blankenship's claims, we cannot conclude that MetLife was unreasonable in crediting the medical advice of the independent doctors over the opinions of Blankenship's doctors and in concluding that Blankenship failed to provide "conclusive medical evidence of Disability." See, e.g., Black v. Long Term Disability Ins., 582 F.3d 738, 746–47 (7th Cir. 2009) (concluding that denial of long-term disability benefits of plan participant diagnosed with multiple aortic aneurysms was not arbitrary and capricious where records reflected treating physicians' statements about her inability to perform her stressful job were internally inconsistent, shifting to support her disability claim).

B.

Considering MetLife's conflict of interest as "a factor" in the review of the plan administrator's benefits decisions, we conclude that the conflict did not render MetLife's decisions arbitrary and capricious. "[T]he burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Doyle, 542 F.3d at 1360. Blankenship has not sufficiently shown, and our independent review of the record has not indicated, that the structural conflict of interest in this case had sufficient "inherent or case-specific importance," Glenn, 128 S. Ct. at 2351, for us to overturn MetLife's benefits decisions.

Although the district court heavily relied on the structural conflict of interest in rejecting MetLife's benefits decisions, we are not persuaded that the record in this case shows that the conflict itself or the large size of Blankenship's requested claims create sufficient concern for a court to deem MetLife's benefits decisions arbitrary and capricious. Even if the potential claim at issue "involves over $510,000, not including future benefits," as the district court stated, Blankenship, 686 F. Supp. 2d at 1236, the size of the award is not enough to be the dispositive factor in this case. Even half a million dollars -- a large sum, to be sure -- is a relative amount when the plan administrator is a global, Fortune 100 company with annual revenues exceeding $50 billion. See Leipzig v. AIG Life

14

Ins. Co., 362 F.3d 406, 409 (7th Cir. 2004) ("[M]ost insurers are well diversified, so that the decision in any one case has no perceptible effect on the bottom line. There is correspondingly slight reason to suspect that they will bend the rules.").

We also see no persuasive indication in the record that, in this specific case, MetLife was improperly motivated by short-term gain in denying Blankenship's long-term disability benefits claims. While it is true that every dollar not paid to a beneficiary is a dollar saved by MetLife in the short run, other factors and different business considerations may be in play. See Marrs v. Motorola, Inc., 577 F.3d 783, 787 (7th Cir. 2009) (noting that an administrator's financial interests in maintaining a reputation for "fair dealing" may deter claim denials).

Nor do we see persuasive evidence in the record of procedural unreasonableness in MetLife's handling and review of Blankenship's claims. For example, we do not conclude, as the district court did, that MetLife's use of "file" reviews by its independent doctors -- instead of live, physical examinations of Blankenship -- counted as evidence that MetLife acted arbitrarily and capriciously, particularly in the absence of other troubling evidence. See Bennett v. Kemper Nat'l Servs., Inc., 514 F.3d 547, 554 (6th Cir. 2008) ("[W]e find nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination . . . .") (citation and internal quotation marks omitted).

15

IV.

We decide nothing today about whether the plan administrator's decisions were absolutely correct in reality. They may possibly not have been. But given the deference owed by courts to the discretionary benefits decisions of plan administrators, we cannot conclude on this record that MetLife's benefits decisions were unreasonable or were arbitrary and capricious due to the conflict of interest. Therefore, we REVERSE the district court's ruling that Blankenship is entitled to full long-term disability benefits for these claims under the Plan and REMAND to the district court with instructions to enter judgment in favor of MetLife.[8]

REVERSED in part and REMANDED with instructions.

_____

[8] We leave alone the district court's ruling in favor of MetLife that MetLife may offset long-term disability benefits with SSDI benefits according to the terms of the Plan. See Blankenship, 686 F. Supp. 2d at 1228-29, 1239.