[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 29, 2012
JOHN LEY
CLERK

_____

No. 10-15387
Non-Argument Calendar
_____

D. C. Docket No. 3:09-cv-01042-HWM-MCR

CAROLYN SMITH,

Plaintiff-Appellant,

versus

THE PENSION COMMITTEE OF
JOHNSON & JOHNSON,
d.b.a. Reed Group,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 29, 2012)

Before EDMONDSON, MARTIN and BLACK, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Carolyn Smith appeals the district court's decision

affirming the termination of her long-term disability benefits. No reversible error has been shown; we affirm.

Smith is a former employee of Johnson and Johnson Care, Inc. Johnson and Johnson offers eligible employees of participating companies the opportunity to participate in the long term disability plan for Johnson and Johnson and affiliated companies (the "Plan"). The ERISA Plan document provided the Plan administrator[1] with discretionary authority to determine eligibility for benefits, to construe the terms of the Plan and to make binding benefit determinations based on its construction of the Plan. The Plan is funded exclusively by contributions made by Plan participants; Johnson and Johnson neither funds nor insures benefits under the Plan.

Plaintiff began to receive long term disability benefits under the Plan in February 1996; the disabling diagnosis was bipolar affective disorder, depressed.[2] In 2004, Plaintiff underwent a comprehensive psychological examination by Dr. Reynolds; and in November 2006, Plaintiff was required to undergo an adult

---

[1]Under the Plan, the Johnson & Johnson Pension Committee (the "Pension Committee") acts as the Plan Fiduciary. The Plan allows the Pension Committee to delegate responsibilities to a claims service organization ("CSO") to administer the Plan. The Pension Committee delegated to Reed Group -- as the appointed CSO -- responsibility for making claim determinations.

[2]In September 2000, Plaintiff's diagnosis included: Personality Disorders, Unspecified; Pathological Personality NOS; Personality Disorder NOS; Psychopathic: Constitutional State; Bipolar Disorders, Other and Unspecified; Bipolar II Disorder; and Manic Depressive Psychosis, Mixed Type.

psychiatric evaluation by Dr. Pruitt. Dr. Pruitt was of the opinion that Plaintiff was unlikely to improve and that her disability was permanent. In June 2008, Plaintiff's attending physician -- Dr. Groble -- provided Reed, the claims service organization appointed by the Pension Committee, with an updated statement on Plaintiff's condition. Dr. Groble was of the opinion that Plaintiff was unable to return to work under any circumstances. But Dr. Groble also informed Reed for the first time that Plaintiff was not complying with treatment recommendations. Defendant states that the receipt of this new information about non-compliance triggered their request that Plaintiff submit to a comprehensive neuropsychological evaluation to allow the development of a full diagnosis and treatment plan.

Plaintiff was angry about submitting to a neuropsychological evaluation; Plaintiff had a fear of psychotherapy because of a bad experience of which Reed was aware. Reed advised Plaintiff that the Plan required her cooperation; Reed warned specifically that her "failure to attend, put forth reasonable effort or otherwise fully cooperate in this evaluation will result in the termination of your disability benefits." Although Plaintiff initially stated she would submit to no further exam or therapy, she finally agreed to the exam but continued to maintain she would allow no therapy.

Dr. Glen performed Plaintiff's neurological evaluation on 10 July 2008. Dr. Glen concluded that the scores on tests she administered were invalid: Plaintiff put forth suboptimal effort and appeared to exaggerate intentionally her cognitive symptoms. According to Dr. Glen, Plaintiff was "fairly oppositional" during the test; her extremely poor performance on the tests was in marked contrast to observations and reports of current functioning. Dr. Glen opined that Plaintiff's test- taking behavior was highly unusual and much more impaired than that of other patients she had seen with severe brain injury. Dr. Glen saw no evidence of cognitive impairment; Plaintiff's "behavior seemed to reflect personality style and oppositional interactions rather than any underlying psychiatric dysfunction." Because of "characterological and pyschosocial" challenges, Dr. Glen did not believe that Plaintiff could maintain a full-time job; she also did not believe Plaintiff's limitations were due to an underlying psychiatric dysfunction. After all tests results were received and after consideration of Plaintiff's file, Dr. Glen was of the opinion that Plaintiff's performance was likely due to malingering.

Reed notified Plaintiff that her benefits were being terminated based on her failure or refusal to cooperate and to put forth her best effort during testing. The termination letter advised Plaintiff specifically that she should provide Reed with an explanation of her test performance if she wished to challenge the termination.

4

In her appeal of the termination decision, Plaintiff submitted only a letter from her treating psychiatrist, Dr. Groble. Dr. Groble's letter took issue with Dr. Glen's diagnoses and functional abilities assessment. About the stated reason for the termination -- Plaintiff's failure to cooperate and malingering -- Dr. Glen said only that Plaintiff was

> emotionally distrustful and traumatized by past professional contacts including a social worker divulging "confidential information leading to the loss of custody of her children. The patient has been afraid, as a result, to even be in any further counseling that might have improved her adjustment emotionally and potentially allowed rehabilitation.

Defendant sent Plaintiff's claim for a physician's file review to determine if medical documentation supported a finding of a cognitive impairment that would impair Plaintiff's ability to participate in testing. Dr. Marie-Claude Rigaud concurred in Dr. Glen's conclusions: the objective medical findings showed no cognitive impairment which would adversely affect Plaintiff's ability to complete psychological and neuropsychological testing.

Plaintiff's first appeal was denied by Reed. Plaintiff exercised her right to a second appeal and submitted -- in addition to Dr. Groble's letter -- the results of an orthopedic exam she had in connection with litigation in which she was a

5

claimant. The results of the orthopedic exam failed to address Plaintiff's ability to cooperate; and it noted no failure to cooperate in the orthopedic exam.

Plaintiff's second appeal was considered by the Pension Committee. The Pension Committee concluded that the documentation for Plaintiff's claim contained substantial evidence to support Reed's benefit denial determination because she failed to cooperate during required testing and failed further to provide evidence that her failure to cooperate was the result of cognitive deficits.[3]

ERISA itself provides no standard for review of the benefits decision of plan administrators. Firestone Tire & Rubber Co., v. Bruch, 109 S.Ct. 948, 953 (1989). Based on Supreme Court guidance in Firestone and Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348 (2008), we have established a multi-step framework for review of ERISA benefit decisions:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

---

[3]The Pension Committee also noted that Plaintiff did not satisfy the definition of total disability under the Plan because clinical assessments showed she was able to work a less than eight-hour day. The district court only reviewed the reasonableness of the termination on the failure-to-cooperate basis specified. We, too, only review that basis.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship v. Metropolitan Life Insur. Co., 644 F.3d 1350, 1355 (11th Cir. 2011).

The district court was of the opinion that Plaintiff's long history of established disability on the basis of psychological and emotional impairments raised a question of fact about whether Defendant's decision was de novo wrong. But even if it was de novo wrong, the district court concluded that Defendant did not abuse its discretion, and its decision was not arbitrary and capricious and, after consideration of the entire record, termination was a reasonable determination. We agree.

The Plan conditioned continued eligibility for disability benefits on compliance with recommended treatment and cooperation during evaluations requested pursuant to the Plan. We cannot say it was unreasonable to request a comprehensive reevaluation of Plaintiff's condition once Plaintiff's physician gave notice that Plaintiff failed to comply with treatment recommendations. According to Drs. Glen and Rigaurd, Plaintiff refused to put forth her best efforts during that comprehensive reevaluation; the testing results had no validity. Plaintiff was offered the opportunity to submit additional documents to explain her test performance. The documents submitted failed to show that Plaintiff was incapable of participating and cooperating fully in the testing process. We cannot say that the Pension Committee acted unreasonably or in an arbitrary and capricious manner when it determined that Plaintiff's eligibility for benefits under the Plan was nullified by her non-cooperation during testing procedures.

Plaintiff argues that the deferential arbitrary and capricious standard should not apply because "procedural irregularities" attended the termination decision. Plaintiff argues that three medical evaluations over a four-year period were abusive and evidence Defendant's bad faith. Also Plaintiff contends that Plaintiff's failure to follow treatment recommendations of her physician -- the purported reason for

the last of these evaluations -- is unrelated to the intensive neuropsychological testing that Plaintiff was forced to endure.

Plaintiff does not contend that Defendant operated under a conflict of interest, at least as conflict of interest is typically understood in this context: Defendant had no financial interest in the benefit decision. Plaintiff's protestations to the contrary notwithstanding, the asserted "procedural irregularities" establish no conflict sufficient to support Plaintiff's argument that a heightened standard of review should apply.

Under the standard of review of benefit decisions set out in <u>Blankenship v. Metropolitan Life Insur. Co.</u>, Defendant's termination of Plaintiff's disability benefits must be affirmed.

AFFIRMED.