[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15360
Non-Argument Calendar
_____

D.C. Docket No. 2:14-cv-01074-WKW-DAB

DAVE BRYANT,
VIKKI BRYANT,

Plaintiffs-Appellees,

versus

COMMUNITY BANKSHARES, INC.,

Defendant-Appellant,

THE ESTATE OF STEVEN C. ADAMS, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(June 12, 2018)

Before WILLIAM PRYOR, MARTIN and JILL PRYOR, Circuit Judges.

PER CURIAM:

Community Bankshares Inc., appeals the summary judgment in favor of and the award of prejudgment interest to Dave and Vikki Bryant on their complaint to enforce their rights to the distribution and redemption of stock in an employee stock ownership plan maintained by Bankshares. The district court ruled that the plan administrator acted arbitrarily and capriciously by disregarding "specific and mandatory provisions of the plan" that required Bankshares to honor the Bryants' elections to diversify. We affirm.

## I. BACKGROUND

Bankshares served as the holding company for several banks, including Community Bank & Trust in Union Springs, Alabama, where the Bryants worked. Dave served as the president of the bank, its chief executive officer, and the vice chairperson of its board, and he and his wife, Vikki, participated in the employee stock ownership plan.

The written plan document defined the role of the plan administrator. Paragraph 8.4 required the plan administrator to act "in accordance with the Plan and consistent with the fiduciary responsibility provisions of ERISA Title I[.]" Paragraph 7.5 gave the plan administrator "duties and powers as may be necessary to discharge its duties," which included the rights "to construe and interpret the

Plan, decide all questions of eligibility and determine the amount, manner and time of payment of any benefits." Paragraph 7.5 also stated that "[t]he plan administrator shall have no power to add to, subtract from or modify any of the terms of[,] . . . to change or add to any benefits provided by . . ., or to waive or fail to apply any requirements of eligibility for a benefit under the Plan."

The written plan document entitled employees, like the Bryants, who participated in the plan for ten years and were at least 55 years old to diversify part of the company stock in their individual plan accounts. Paragraph 8.3 of the written plan stated that "eligible Participant[s] shall, during any Qualified Election Period, be permitted to diversify the investment of a portion of [their] Employer Contribution Account[s]." Consistent with the plan, in February 2009 Bankshares mailed the Bryants written notices on which they could elect, by April 15, 2009, to diversify their plan accounts. The election forms stated that the Bryants' elections would "be implemented no later than June 30, 2009."

The Bryants elected to have part of their plan accounts transferred to their individual retirement accounts. As provided in paragraph 8.3 of the plan, Vikki "elect[ed] . . . to diversify the investment of twenty-five percent . . . of [her] Account in the Plan, determined as of the Annual Valuation Date for the Plan Year preceding the Plan Year in which such election is made[.]" And "in [Dave's] case . . . [because] the election year . . . [was his] last such election, [he was allowed to

3

diversify] fifty percent (50%)" of his account. Paragraph 1.36 identified the "annual valuation date" as "December 31 of each Plan Year."

As of December 31, 2008, the value of Bankshares stock was $11 per share. At the time of election, Vikki's account had 880.205842 shares valued at $9,682.26 and $1,704.12 in cash. Dave's account had 9,197.930607 shares valued at $101,177.24 and $8,946.30 in cash.

The Bryants' elections entitled them to receive shares of company stock that they could "put to the Company and the Plan" to redeem. Paragraph 8.3 of the plan stated that, after a participant "direct[ed] the Plan Administrator to distribute (or transfer to an Individual Retirement Account or another qualified retirement plan) shares of Company Stock . . . equal to that portion of the Participant's . . . Account that is covered by the election," the "transfer or distribution shall be made no later than ninety (90) days after the last day of the Qualified Election Period during which such Participant directed such investment." Under paragraph 5.8, "[a]ny Participant . . . receiving a distribution of Company Stock from the Plan . . . shall have a 'put option' on such shares, giving him the right to have the Company purchase such shares" at a price equaling "the fair market value as of the Annual Valuation Date which precedes the date the put option is exercised." The plan also had "the opportunity" to "assume[] the rights and obligations of the Company

under the put option." The plan stated that the company "shall . . . [c]los[e] . . . the sale . . . within thirty (30) days after the put option is exercised."

Bankshares was struggling financially, which reduced the value of its stock. Bankshares entered into an agreement effective September 16, 2009, in which it agreed to refrain from purchasing or redeeming its stock without the consent of the Federal Reserve Bank and the Bank Commissioner. In October 2009, Bankshares obtained a special valuation of its stock. An independent appraiser valued Bankshares stock at $2.30 per share as of September 30, 2009.

On November 2, 2009, Bankshares informed its plan participants about its written agreement with the Federal Reserve. Bankshares stated that it lacked "cash, or the ability to raise additional cash, to implement fairly participants' diversification elections" and that participants had the right to change or retain their earlier elections to diversify. If Bankshares "honor[ed]" an election to diversify, it warned that it would distribute shares of common stock, the plan would not offer a put option until the Federal Reserve lifted the restriction on redemption, the price for redemption would be the "fair market value at that time and in accordance with such rules as the Plan Administrator may establish," and the stock distribution would be a taxable event. Bankshares sent plan participants a revised election form, which was a copy of its original election form with a line drawn through its February 2009 date and above which was written "11-30-09."

5

The Bryants submitted revised election forms that requested their shares remain invested in the plan. As of December 31, 2009, the value of Bankshares stock had dropped to $0.15 per share. In January 2010, the Georgia Department of Banking and Finance closed a bank held by Bankshares and named the Federal Deposit Insurance Company as receiver.

In June 2011, the Bryants received a distribution of the cash in their accounts. Vikki received $1,667.31 and Dave received $8,806.53. In 2012, the board of directors for Bankshares became the plan administrator and voted to terminate the plan, but as of May 28, 2016, the plan had yet to terminate.

In March 2014, the Bryants demanded payments from Bankshares that equaled 50 percent of the value of Dave's account and 25 percent of the value of Vikki's account, but the plan administrator denied the Bryants' demands. The plan administrator responded that Bankshares had been fiscally incapable of honoring the Bryants' elections to diversify and that they had "revoked" their initial requests by electing to leave their shares in the plan. The denial letters stated,

> Ordinarily, the Plan Administrator would have been obligated to implement [the Bryants'] April 2009 Diversification Request[s] on or before June 30, 2009. At the time, however, [Bankshares] stock had dramatically declined in value . . ., and [Bankshares] financial situation was deteriorating further. [Bankshares] knew that the value would continue to decrease (and indeed, [it] fell to just $2.30 by November 2009). If the stock had been transferred to IRA[s], [Bankshares] was not in a position to honor the put option to repurchase the stock, nor did [Bankshares] have a good valuation for the stock since it was declining so rapidly in value. The Plan also

6

could not distribute cash . . . for the value of stock because that would have had an adverse effect on other Plan participants. [Bankshares] decided to suspend all diversification requests until it could develop a plan that would be fair and equitable to all Plan participants. [Bankshares] had a fiduciary responsibility to act for the benefit of all participants and could not honor diversification elections to the detriment of other Plan participants. As a result, [Bankshares] properly concluded that it could not grant [the Bryants'] April 2009 Diversification Request[s].

[The Bryants'] Claim[s] [are] also denied because [they] ultimately elected for [their] share[s] to remain invested in the Plan. In [their] November 2009 Diversification Request[s], [the Bryants] voluntarily elected for [their] share[s] to remain invested in the Plan. [The Bryants] could have directed the Plan to transfer [their] share[s] to an IRA and the Plan would have done so. . . . [The Bryants'] November 2009 Diversification Request[s] revoked [their] April 2009 Diversification Request[s] and rendered [them] null and void. There [are] no outstanding request[s] by [the Bryants].

The Bryants filed an administrative appeal, which Bankshares denied. Bankshares stated that its actions were governed by section 8.4 of the Plan and federal law, 29 U.S.C. § 1104(a)(1)(A), which imposed on it a fiduciary "duty to act for the benefit of all Plan participants," and that it had determined a "payment for units in the . . . stock fund . . . would have had an adverse effect on the other Plan participants." Bankshares disclaimed "breach[ing] . . . the Plan because [it] was acting in the best interest of all the Plan beneficiaries when it declined to honor [the Bryants'] April 2009 diversification request[s]." Bankshares also stated that "there [was] no outstanding diversification request[s] by" the Bryants because they had responded to the November 2009 letter by "voluntarily electing for [their]

shares to remain in the Plan and . . . revok[ing]" their earlier election, which "nullified and voided their April 2009 diversification request[s]."

The Bryants sued Bankshares, its plan administrators, and its trustees to enforce their rights as plan participants, for breach of fiduciary duties, and for attorney's fees. Bankshares answered that it acted consistent with the written plan document "and in the interests of all participants and beneficiaries of the Plan." Both parties moved for summary judgment.

The district court denied the motion filed by Bankshares and granted in part and denied in part the Bryants' motion. The district court entered an order granting an injunction that enforced the Bryants' rights to diversify, to obtain shares of company stock equaling the part of their accounts covered by the election, and to redeem the stock based on "the December 31, 2008 annual valuation." The district court rejected, for failure to "survive review under the arbitrary-and-capricious standard," the arguments of Bankshares that it lacked an accurate valuation of stock, it was incapable of redeeming stock issued to plan participants, and the plan could refuse to redeem stock because that was detrimental to other plan participants. The reasons Bankshares proffered, the district court stated, "conflict[ed] with the clear, specific, and mandatory terms of the Plan governing stock valuation, a participant's right to make a diversification election, and  a participant's right to exercise a put option on distributed shares[,]" and conflicted

8

with "the Plan administrator['s] . . . written communications to eligible participants [and] to the Bryants . . . ." The district court also rejected as "[un]reasonable" the decision to treat "the Bryants' November 2009 diversification elections . . . [as] waivers of their" original elections due to their lack of a choice in losing their put option; their lack of information that they "were releasing any rights under the Plan"; the failure to advise them of the need to consult with counsel before changing their election; and the absence of a benefit for making a different election. The district court denied the Bryants' claims for breach of fiduciary duties and for attorney's fees.

The district court awarded the Bryants prejudgment interest as compensation "for their losses . . . and [to] ensure that the Plan administrator does not obtain 'a windfall as a result of its wrongdoing.'" The district court "f[ound] that [a] prejudgment interest rate of 1.5% [per month (18% annually)], by reference to [Alabama Code] § 27-1-17(c), [was] appropriate . . . [based on] the wrongful denial of pension benefits under ERISA." And the district court decided to accrue interest beginning on March 12, 2014, when the Bryants demanded payment from Bankshares for "breach[ing] its contractual obligation to diversify [their] accounts."

## II. STANDARDS OF REVIEW

9

We apply three standards of review in this appeal. We review *de novo* a summary judgment. *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1306 (11th Cir. 2016). We also review *de novo* the decision to "affirm[] or revers[e] a plan administrator's ERISA benefits decision, applying the same legal standards that governed the district court's decision." *Id.* (quoting *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011)). To the extent an employee "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," that determination is reviewed "under the arbitrary and capricious standard." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114, 115 (1989). "The award of an amount of prejudgment interest in an ERISA case is a matter committed to the sound discretion of the trial court." *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1484 (11th Cir. 1995) (internal quotation marks and citation omitted).

## III. DISCUSSION

The Employee Retirement Income Security Act of 1974 requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), which serves at least two important purposes. First, a written plan enables an employee to determine "exactly what his rights and obligations are under the plan." *Curtiss-Wright Corp. v. Schoonejongen*,

10

514 U.S. 73, 83 (1995) (quoting H.R.Rep. No. 93–1280, p. 297 (1974) U.S. Code Cong. & Admin. News pp. 4639, 5077, 5078). Second, a written plan ensures that the plan administrator "discharge[s] his duties . . . for the exclusive purpose of providing benefits to participants and their beneficiaries[] and . . . in accordance with the documents and instruments governing the plan," 29 U.S.C. § 1104(a)(1)(A)(i), (a)(1)(D). *See Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1334 (11th Cir. 2006).

The written plan for the Bankshares employee stock ownership plan obligated it to comply with the Bryants' elections to diversify their plan accounts. Use of the mandatory term "shall" in the paragraphs governing participant benefits established that the Bryants were entitled to diversify, to obtain stock, and to have the company redeem the stock. *See Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011) ("the use of the term 'shall' is one of requirement"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 114 (2012) ("[W]hen the word *shall* can reasonably be read as mandatory, it ought to be so read."). Paragraph 8.3 of the written plan stated that plan participants "shall . . . be permitted to diversify" and, if they made such an election, the "transfer or distribution [of shares of company stock] shall be made . . . ." After the distribution of stock, paragraph 5.8 provided that participants "shall have a 'put option' on [their] shares, giving [them] the right to have the

11

Company purchase such shares" at a price equaling "the fair market value as of the Annual Valuation Date which precedes the date the put option is exercised." Under the "plain and ordinary meaning of the . . . terms" of the written plan, the Bryants were entitled to elect to diversify. *See Alexandra H.*, 833 F.3d at 1307.

Bankshares argues that the plan administrator was allowed to disregard the terms of the plan for three reasons, but these arguments fail. First, Bankshares argues that the plan administrator was entitled to "interpret[] the contract" in a way that "uniformly" avoided "harm[] to the Plan and other participants," but "[a]s a fiduciary, [the plan administrator was required to] . . . administer [the] plan . . . 'in accordance with the documents and instruments governing the plan,'" *Heffner*, 443 F.3d at 1334 (quoting 29 U.S.C. § 1104(a)(1)(D)). Second, Bankshares argues that the plan administrator could deny the Bryants' elections based on paragraph 7.3 of the plan that allowed him to "determine all questions . . . including . . . any situation not specifically covered by the provisions of the plan," but we decline to address in the first instance an argument that Bankshares did not present to, and does not argue it was unable to raise in, the district court, *see Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330–33 (11th Cir. 2004). Third, Bankshares argues that "the language of the Plan . . . permitted . . . [the plan administrator] not to strictly follow the diversification and put option terms of the Plan," but that is contrary to the language of the plan. Paragraph 7.5 states that "[t]he plan

administrator shall have *no power* to add to, subtract from or modify any of the terms of . . . [or] to change or add to any benefits provided by . . . the Plan." (Emphasis added.) Bankshares offers no reasoned basis for the plan administrator's decision to override the mandatory and unequivocal terms of the plan.

Bankshares also argues that "the Plan Administrator's decision is supported by the evidence" that the Federal Reserve Bank had "prohibited . . . Bankshares from redeeming its stock," but we, like the district court, reject the argument as a post-hoc explanation for denying the Bryants' elections to diversify. The plan administrator did not mention the prohibition on the original election form sent in February 2009 or on the revised election form dated November 2009. And neither the plan administrator nor Bankshares mentioned the prohibition in their decisions denying the Bryants' demands for payment or their administrative appeal. When Bankshares told its plan participants about the prohibition in its November 2009 letter, it stated it "is currently subject to a Written Agreement . . . that prohibits [it] from purchasing its Common Stock" and "cannot honor the obligation under the put option to purchase Common Stock distributed from the ESOP." The written agreement had an effective date of September 16, 2009, well after the June 2009 deadline expired for Bankshares to implement the Bryants' election.

The district court did not err in entering judgment against Bankshares and in favor of the Bryants' claim to enforce their rights under the plan. The refusal of the

plan administrator to honor the Bryants' elections to diversify was arbitrary and capricious. The explanations given for the plan administrator's decision conflicted with the unambiguous and mandatory language in the written plan and with the information communicated to plan participants. *See Yochum v. Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d 541, 547 (11th Cir. 2000) (concluding the denial of a claim for benefits was arbitrary and capricious "in that the plain language of the Plan and the Agreement were violated"). The Bryants were entitled to diversify their accounts, to have company stock transferred to their individual retirement accounts, and to exercise their rights to have the stock redeemed by the company. Bankshares does not challenge the findings that Vikki is entitled to 220 shares of stock and that Dave is entitled to 4,599 shares of stock, which when redeemed at $11 per share, entitles them, respectively, to $2,420 and $50,589.

The district court also did not abuse its discretion when it used the Alabama interest statute to determine the rate by which to calculate prejudgment interest owed to the Bryants. The Employee Retirement Act does not mandate prejudgment interest. The Alabama interest statute is intended to compensate beneficiaries when their "health benefit plan . . . fails to . . . pay a clean written claim . . . within the [applicable] time periods." Ala. Code § 27-1-17(c). The district court reasonably applied section 27-1-17(c) by analogy to make the Bryants whole after Bankshares wrongfully refused to honor their elections and benefitted from withholding their

14

money. *See Florence Nightingale*, 41 F.3d at 1484 (affirming the use of the Alabama interest statute "as an analogy to fill a gap in ERISA law"); *Smith v. Am. Int'l Life Assur. Co. of New York*, 50 F.3d 956, 958 (11th Cir. 1995) (affirming prejudgment interest on an award of accidental death benefits under an insurance policy governed by the Employee Retirement Act). Bankshares argues that section 27-1-17(c) "supplies an interest rate for . . . [health care benefit] claims only," but Bankshares identifies no statute that better fits the situation. Bankshares also argues that the interest rate in section 27-1-17(c) is "exorbitant" and exceeds the statutory prejudgment rate of 7.5 percent, Ala. Code § 8-8-10(a), but we have concluded that the "use of [a] higher interest rate [is] not an abuse of discretion," *Smith*, 50 F.3d at 958. We cannot say that the district court abused its discretion when it "has done nothing more than that which we approved in *Nightingale*." *Id.*

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of the Bryants.

15