[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 21-11919

————————————————

CAROL H. STEWART,

Plaintiff-Appellant,

*versus*

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:17-cv-01423-KOB

————————————————

Before NEWSOM, TJOFLAT, and HULL, Circuit Judges.

NEWSOM, Circuit Judge:

Carol Stewart sued to obtain two insurance benefits that she believes Hartford Insurance Company owes her: (1) long-term disability payments and (2) a waiver of life-insurance premiums. Although it concedes that Stewart was covered by its policy, Hartford contends that she was ineligible for those benefits. Hartford's policy indisputably granted it discretion to make benefits determinations, and we conclude that its determinations were permissible. Accordingly, we must defer to Hartford's determinations and affirm the district court's order granting it summary judgment.

## I

In 2007, prominent Birmingham attorney Carol Stewart's physician diagnosed her with Parkinson's disease.[1] At the time, Burr Forman LLP, Stewart's employer, provided her with disability insurance through its ERISA health plan. Sun Life Assurance Company of Canada, which serviced that plan, began paying Stewart partial, and later total, disability benefits. In 2010, Burr Forman

---

[1] Stewart's professional accomplishments are impressive. She has been profiled in *Chambers*, *Best Lawyers in America*, and *Alabama Super Lawyers*; she has served on the Board of Bar Commissioners of the Alabama State Bar, on the Executive Committee of the Birmingham Bar Association, and in the Alabama Law Institute; and the Birmingham Bar Association honored her with the L. Burton Barnes Award for Public Service.

cancelled its policy with Sun Life and switched the administration of its ERISA health plan over to Hartford Insurance.

The new Hartford policy contained an exclusion clause specifying that a member of the firm was ineligible for disability-insurance payments if she was receiving "benefits for a Disability under a prior disability plan that: 1) was sponsored by [her] Employer; and 2) was terminated before the Effective Date of The Policy." Because Sun Life was still paying Stewart disability benefits, Hartford found that Stewart was "receiving benefits for [a] Disability under a prior disability plan" that had been "terminated" before its own policy went into effect and, consequently, that she wasn't eligible for Hartford disability benefits.

Hartford also provided life insurance. Its life-insurance policy specified that one who was "Disabled" needn't pay premiums for coverage, and it defined "Disabled," in relevant part, as being unable to perform "any work for which [one is] qualified by: 1) education; 2) training; or 3) experience." Following a multi-step appeals process, Hartford determined that Stewart wasn't "Disabled" within the meaning of its policy and that she therefore had to pay life-insurance premiums.

Stewart filed suit to obtain relief under 29 U.S.C. § 1132(a), which allows an insurance-plan participant to bring a civil action to "recover benefits due to [her] under the terms of [her] plan." The district court granted Hartford summary judgment. Stewart appeals, arguing (1) that she is entitled to disability insurance from Hartford because she doesn't fall into its policy's exclusion clause

and (2) that she is disabled and should not have been required to pay premiums for life-insurance coverage.[2]

## II

When "reviewing a plan administrator's benefits decision" this Court conducts the following six-step analysis:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

---

[2] "We review de novo a district court's ruling affirming or reversing a plan administrator's ERISA benefits decision, applying the same legal standards that governed the district court's decision." *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011) (per curiam). We also review de novo a district court's grant of summary judgment. *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1306 (11th Cir. 2016).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) (per curiam).

## A

We begin with whether Stewart is entitled to disability payments. Although we needn't definitively decide the question, we are inclined to think that Stewart may have the better reading of the policy's disability-insurance provision and that Hartford's interpretation is de novo "wrong" at Step 1 of the *Blankenship* analysis. Even so, we hold that Burr Forman's plan vested Hartford with discretion in reviewing claims (Step 2), that Hartford's interpretation of the provision and its decision in Stewart's case were "reasonable" (Step 3), and that any conflict of interest that Hartford had (Steps 4 and 5) didn't lead it to make an arbitrary and capricious determination (Step 6). Accordingly, we agree with the district court that Hartford is entitled to summary judgment. Let us explain.

6                  Opinion of the Court                21-11919

Again, the relevant policy language states as follows, with our emphasis added:

> If You are receiving or are eligible for benefits for a Disability under a *prior disability plan* that:
>
> 1) was sponsored by Your Employer; and
>
> 2) was terminated before the Effective Date of *The Policy*;
>
> no benefits will be payable for the Disability under *The Policy*.

Doc. 32-1 at 17.

Hartford contends that "prior disability plan" refers to the old Sun Life policy, and, therefore, that Stewart was receiving benefits under a "prior disability plan" that was both "sponsored by" Burr Forman and "terminated before" its own policy's effective date. Br. of Appellee at 31–32. On a de novo reading, we tend to disagree. The policy exclusion refers, separately, to a "prior disability plan" and (twice) to a "Policy." When interpreting a written text—a contract no less than a statute—we generally understand "a material variation in terms [to] suggest[] a variation in meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 51, 170 (2012). From Hartford's decision to use different terms, then, we're inclined to conclude that a "plan" is different from a "[p]olicy"—the former referring to the benefits package that employers provide employees, and the latter referring to the contract pursuant to which those benefits are administered.

And even aside from the usual linguistic and semantic conventions, three additional data points, we think, reinforce that understanding.

First, Hartford's contract elsewhere uses the phrase "prior policy," showing that Hartford knew how to draw the plan-policy distinction. *See* Doc. 32-1 at 12 ("Is there continuity of coverage from a Prior Policy?"); *id.* (explaining that if an individual was "1) insured under the Prior Policy; and 2) not eligible to receive benefits under the Prior Policy; on the day before the Policy Effective Date," his coverage will continue); *id.* (waiving a minimum-coverage waiting period for any individual who "received Monthly benefits for disability under the Prior Policy" if a recurring disability "would have been covered without any further [waiting] period under the Prior Policy"). Indeed, Hartford expressly defined "Prior Policy" to mean "the long term disability insurance carried by the Employer on the day before" Hartford's own policy went into effect. *Id.* at 23

Second, in its answer to Stewart's complaint, Hartford made several statements and admissions reflecting its understanding of the difference between a "plan" and a "policy": (1) Hartford stated that Burr Forman sponsored "the Plan"; (2) Hartford "admit[ted]" that Sun Life and Hartford provided "Policies" insuring "portions of Burr's Plan"; and (3) Hartford admitted to being the "Administrator for the . . . Policy, but specifically denie[d] that it [wa]s the Plan Administrator."

Third, ERISA itself seems to recognize that a "plan" is distinct from the insurance *policy* that services it. It says that "'plan' means an employee welfare benefit plan" and, separately, that "'employee welfare benefit plan' . . . mean[s] any plan . . . established . . . by an employer . . . for the purpose of providing for its participants . . . *through the purchase of insurance or otherwise*, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness." 29 U.S.C. § 1002(1) & (3) (emphasis added).

On a de novo interpretation, therefore, our inclination would be to hold (1) that the phrase "prior disability plan" refers to Burr Forman's ERISA plan, whereas the term "Policy" refers to the particular insurance contract that services the plan, (2) that Burr Forman's "plan" was never "terminated," and therefore (3) that the disability-benefits exclusion doesn't apply to Stewart.

But because this is an ERISA-benefits case, our analysis isn't finished—there are still five steps to go. Step 2 requires us to determine whether Hartford's policy vested it with discretion when reviewing benefits claims. It did—the policy expressly states that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy." Accordingly, we continue to Step 3, where we ask whether "reasonable" grounds supported Hartford's interpretation and decision. We conclude that they did.

Although it might not be the *best* reading of the policy exclusion, it was reasonable for Hartford to interpret the phrase "prior disability plan" as referring to the Sun Life policy. While

different words are usually presumed to have different meanings, that canon—"more than most other canons"—"assumes a perfection of drafting that, as an empirical matter, is not often achieved." Scalia & Garner, *supra* at 170. "Though one might wish it were otherwise, drafters more than rarely use . . . different words to denote the same concept." *Id.* And accounting for some unfortunate imprecision, the words "plan" and "policy" can be interchangeable. *Compare Plan*, Oxford Dictionary of English 1357 (3d ed. 2010) ("a detailed proposal for doing or achieving something: . . . a scheme for the regular payment of contributions toward a pension, savings account, or *insurance policy*" (emphasis added)), *with Policy*, *id.* at 1374 ("a contract of insurance"). And if "prior disability plan" is interpreted to refer to an earlier "policy," Stewart was indeed "receiving . . . benefits for a Disability under a prior disability plan that . . . was sponsored by [Burr Forman]; and . . .was terminated before the Effective Date of" the Hartford policy. Accordingly, although we might have read the provision differently, we can't say that Hartford's interpretation was unreasonable.

On, then, to Step 4. There, we ask whether Hartford had a conflict of interest and, if so, we skip to Step 6 and ask whether that conflict led to an arbitrary and capricious decision. Per *Blankenship*, a conflict of interests "exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." 644 F.3d at 1355. That description describes Hartford's dual role here precisely. Even so, *Blankenship* goes on to clarify that such a conflict alone "constitutes no license, in itself,

for a court to enforce its own preferred *de novo* ruling about a benefits decision." *Id.* at 1356; *see also Conkright v. Frommert*, 559 U.S. 506, 512–13 (2010) ("[W]hen the terms of a plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict. . . . [A] systemic conflict of interest does not strip a plan administrator of deference." (citation omitted)).  Rather, at Step 6, we must determine whether the conflict led to an arbitrary and capricious decision.  And as already explained, "there was a reasonable basis for [Hartford's] decision, based upon the facts as known to the administrator at the time the decision was made." *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1326 (11th Cir. 2001) (quotation omitted).  Moreover, as a matter of common sense, it was reasonable for Hartford to interpret its policy to prevent an insured from receiving payments from two different sources for the same disability.

In sum, Hartford had discretion to determine whether Stewart was eligible for benefits under its policy, and it exercised that discretion reasonably.  Accordingly, we affirm the district court's decision rejecting Stewart's claim to disability benefits.

## B

We must also decide whether Hartford correctly denied Stewart a waiver of life-insurance premiums.  We hold that it did. Hartford's life-insurance policy states that "[t]o qualify for Waiver of Premium[s] You must: . . . be covered under The Policy and be under age 60 when You become Disabled."  Doc. 32-1 at 61.  And

it explains that "Disabled means You are prevented by injury or sickness from doing any work for which You are qualified by: 1) education; 2) training; or 3) experience." *Id.*

We hold that, at *Blankenship*'s Step 1, applying the plain meaning of the words in the contractual definition, Stewart was not "Disabled" and thus was not entitled to a waiver of premiums.[3] We must parse two key terms to determine whether Stewart was definitionally "Disabled": "work" and "qualified."

First, "work." In this context, it seems clear to us that the term "work" denotes an effort made to attain one's income or

_____

[3] As an initial matter, Stewart contends that Hartford's determination that she could "work" was "wrong" because it conflicted with our decision in *Helms v. Monsanto Co.*, 728 F.2d 1416, 1421 (11th Cir. 1984). Hartford rejoins that Stewart forfeited the position in support of which she now cites *Helms*—namely, that she is "Disabled" within the meaning of Hartford's premium-waiver provision because she can't engage in full-time gainful employment—by failing to present it to the district court. *See* Br. for Appellee at 46. We needn't decide the forfeiture question here—which arguably implicates the grey area between forfeitable "positions and issues" and non-forfeitable "arguments," *see, e.g.*, *Secretary, U.S. Dep't of Labor v. Preston*, 873 F.3d 877, 883 n.5 (11th Cir. 2017)—because we find *Helms* distinguishable, in any event. In that case, we interpreted a long-term-disability policy providing income-replacement benefits, not a waiver-of-premium provision in a life-insurance contract, and so far as we are aware, this Court has never applied *Helms* to a provision containing the "any work" language found in Hartford's policy. In short, because *Helms* interpreted different language in a different contract in a case arising under different facts, we aren't bound by it. *See United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) ("[T]he 'holding' of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision.").

livelihood.  One commonly used dictionary, for instance, defines "work" as "activity involving mental or physical effort done in order to achieve a result" or "as a means of earning income; employment"—as in "*I'm still looking for work.*"  *Work*, Oxford Dictionary of English at 2043.  Another defines work as "[a]ction or activity involving physical or mental effort and undertaken in order to achieve a result, esp. as a means of making one's living or earning money; labour; (one's) regular occupation or employment." *Work*, Oxford English Dictionary (3d ed. 2014); *see also Work*, Webster's Third New International Dictionary 2634 (2002) ("the labor, task, or duty that affords one his accustomed means of livelihood"); *Work*, Black's Law Dictionary (11th ed. 2019) ("exertion to attain an end, esp. as controlled by and for the benefit of an employer").

Next, to be "qualified" is to be "officially recognized as being trained to perform a particular job" or "competent or knowledgeable to do something."  *Qualified*, Oxford Dictionary of English at 1451.  But the term "qualified" is itself *qualified* by the context in which it appears in Hartford's policy.  The policy states that the employee's qualifications must result from her "education," "training," or "experience."  Those modifiers—education, training, and experience—indicate the acquisition of knowledge or skills.

Putting it all together, then, to be entitled to a waiver of premiums, Stewart must have been unable (1) to engage in any means of earning income (2) for which she was competent based on her knowledge or skill acquired over time.  We conclude that Stewart

*was* able to perform work for which she was qualified by her education, training, and experience.

We know, of course, that Stewart was ultimately educated, trained, and experienced as a lawyer. But she also graduated from high school and college and was thus qualified to perform work requiring less specialized skills, as well. And here, the record shows that Stewart could sit for a couple of hours, stand for half an hour, and walk for half an hour. It also shows that while Stewart suffered from mild cognitive impairment, she retained the ability to perform less demanding tasks that didn't require high-level analytical or organizational ability. Hartford was entitled to consider those facts when determining whether Stewart could perform "any work." *See Blankenship*, 644 F.3d at 1356 (holding that an insurance company was entitled to credit "advice of the independent doctors over the opinions of [the insured's] doctors"). While Stewart might not have been able to ply her trade as a lawyer, the record supports Hartford's determination that she could perform less demanding sedentary work.

Even assuming that Stewart could work only part-time, that counts as "any work." "The Supreme Court has said, and so have we, that the term 'any' in a statute has a 'broad,' 'powerful,' and 'expansive' meaning; 'it does not mean "some" or "all but a few," but instead means "all."'" *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 726 (11th Cir. 2008) (per curiam). The word "any," that is, expresses a lack of restriction when choosing something from a specified class. *See Any*, Oxford Dictionary of English at 70. Here,

that class is "work." To be sure, "any" can't be read so broadly that it papers over the noun that follows it, but we don't have that problem here. Because part-time work certainly constitutes "work," *see Part-time*, Oxford Dictionary of English at 1296 (as in "*part-time jobs*," "*part-time teacher*," or "*he only worked part-time*"), it satisfies the policy's terms so long as the type of work at issue is "a means of earning income; employment" or one's "livelihood," *Work, id.* at 2043; *Work*, Merriam-Webster's Collegiate Dictionary 1442 (11th ed. 2003). And, of course, in this context part-time work must be work that Stewart is qualified for by her "education," "training," or "experience."

Because Hartford's interpretation was not de novo wrong, we can "end the inquiry" at Step 1 "and affirm the decision." *Blankenship*, 644 F.3d at 1355.

In any event, as already explained, Stewart's insurance policy gave Hartford discretion in deciding benefits claims, and Hartford didn't abuse that discretion when it determined that Stewart could perform "any work" consistent with her training or experience. Interpreting "any work" broadly to mean any work whatsoever was at the very least reasonable. As already explained, doctors determined that Stewart could perform some work; even Stewart's own treating physician opined that she could perform part-time work with certain accommodations. And Stewart herself acknowledged that she could perform everyday tasks. Thus, Hartford's decision was not arbitrary and capricious, and under *Blankenship*—

21-11919                Opinion of the Court                15

even if we disagreed with it—we'd be nonetheless obliged to defer
to it.

★  ★  ★

To summarize, Stewart was not entitled to disability pay-
ments because Hartford's interpretation of the disability exclusion
was reasonable, and its conflict of interest didn't lead it to make an
arbitrary or capricious decision.  Likewise, Stewart was not entitled
to a waiver of life-insurance premiums because she wasn't disabled
within the meaning of Hartford's life-insurance policy.[4]

**AFFIRMED**.

---

[4] Stewart also brought a claim under 29 U.S.C. § 1132(a)(3) for equitable rem-
edies, which the district court dismissed.  Because that claim is based on the
same facts, it fails for the same reason.