CARLOS E. MENDOZA, UNITED STATES DISTRICT JUDGE
THIS CAUSE is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 38) and Defendant's Response and Cross Motion for Summary Judgment (Doc. 39). Plaintiff also filed a Reply and Response in Opposition (Doc. 42). For the reasons set forth below, Plaintiff's motion will be granted, and Defendant's motion will be denied.
I. BACKGROUND [1]
During the relevant timeframe, Plaintiff was insured under a Long-Term Disability Insurance Policy ("Policy"). (Admin. R. ("AR") at 1, 7; Doc. 38 at 4 ¶ 1-2; Doc. 39 at 3 ¶ 1-2 & n.3). On August 10, 2015, Plaintiff submitted a claim for benefits under the policy. (AR at 392-93). Plaintiff's claim was based on debilitating pain due to injuries that resulted from an April 20, 2012 motor vehicle collision. (Id. at 392, 845; Doc. 38 at 5 ¶ 10; Doc. 38 at 3 ¶ 10). Plaintiff's claim and his appeal thereof were denied, (id. at 169, 185), and this case ensued.
To receive benefits under the Policy, Plaintiff was required to submit written proof that he was totally disabled-i.e., that he was unable to "perform the substantial and material duties of his[ ] Regular Occupation." (id. at 10, 15). Plaintiff's Regular Occupation was being a dentist. (id. at 750 (identifying Plaintiff as part of "Class II" under the Policy); id. at 7 (defining "Class 2" as "Associate Managing Dentist"); Doc. 38 at 4 ¶ 1; Doc. 39 at 2 ¶ 1; see also AR at 9-10 (defining "Regular Occupation") ).
In an effort to satisfy his burden under the policy, Plaintiff submitted his full medical history relating to the 2012 collision, which the Court will summarize. Shortly *1339 after the collision, Plaintiff was diagnosed with cervicalgia, (AR at 845), and an MRI completed in May 2012 showed a herniated disc at C3-C4 and bulging discs at C4-C5 and C5-C6, (id. at 701). Plaintiff sought treatment from a chiropractor, Dr. Chet Barton, for pain in his right shoulder, neck, and back as well as for headaches. (Id. at 368, 387). Dr. Barton referred Plaintiff to an orthopedist, Dr. Richard Smith.
Plaintiff first presented to Dr. Smith on July 17, 2012. (Id. at 482-83). At that time, Plaintiff reported muscle aches; muscle weakness; joint pain; back pain; neck pain that radiated into his right shoulder, which was worse with activity; and numbness and tingling in his thumbs, particularly his right thumb. (Id. at 483). Based on his physical exam, Dr. Smith noted that Plaintiff's range of motion was decreased in all planes by fifty percent and his muscular strength in his upper extremities was a four out of five. (Id. ). Based on Dr. Smith's recommendation, Plaintiff underwent physical therapy and received a series of epidural steroidal injections from October 2012 to January 2013. (Id. at 423-468, 473). Under Dr. Smith's guidance, Plaintiff also obtained and utilized a home traction unit. (Id. at 422). While these treatments appeared to provide Plaintiff with some measure of relief, he continued to complain of pain, numbness, tingling, and weakness. (See e.g. , id. at 424).
Plaintiff also consulted a neurologist, Dr. Marc Sharfman, in April, May, and July 2013. (Id. at 485, 488, 489). Dr. Sharfman noted that Plaintiff may have a "permanent partial impairment." (Id. at 487). Throughout the above-referenced treatment, Plaintiff complained of, among other things, neck pain, right shoulder pain, frequent and severe headaches, and numbness and tingling. (See, e.g. , id. at 413, 416, 488-89, 421, 424, 471, 474, 480, 482). Plaintiff also expressed concerns about his condition interfering with his ability to do his job. (Id. at 412, 416, 473, 489).
In May 2013, Dr. Sharfman conveyed to Plaintiff that he had achieved "maximum medical improvement with a permanent and partial impairment." (Id. at 488). At a follow up appointment in July 2013, Dr. Sharfman again noted that Plaintiff "remains at maximum medical improvement with a permanent partial impairment," and Dr. Sharfman simply "encouraged ongoing health care." (Id. at 486-87). Shortly thereafter, in September 2013, Dr. Smith also concluded that Plaintiff had reached maximum medical improvement unless Plaintiff was willing to undergo surgery. (Id. at 414). Plaintiff opted to continue with conservative care, as opposed to surgery, because the surgery offered no guarantee of improvement. (See id. at 1146). There is no record of Plaintiff receiving any treatment between September 13, 2013, and June 19, 2015.
On June 19, 2015, Plaintiff presented to Dr. Smith's office complaining that his pain level was a ten out of ten. (Id. at 410-11). A new MRI was conducted, which showed the bulging discs at C4-C5 and C5-C6, which were also present in the 2012 MRI. (Compare id. at 408 with id. at 701). It also showed a herniated disc at C6-C7, which had not been present in the 2012 MRI. (Id. ). But, it did not show the herniated disc at C3-C4, which had been present in the 2012 MRI. (Id. ). Plaintiff had a follow up appointment with Dr. Smith on June 30, 2015, where he complained of joint pain; neck pain; pain radiating into the shoulders, arms, hands, and fingers; weakness; numbness; and tingling. (Id. at 405-06). Plaintiff again reported that his pain was a ten out of ten. (Id. at 406). Based on his physical examination, Dr. Smith indicated that Plaintiff's neck strength with regard to flexion, rotation, *1340 and lateral flexion were each a four out of five, but otherwise his motor strength-including the flexion of his fingers-was a five out of five. (Id. ). Dr. Smith also noted that Plaintiff's right and left biceps reflexes were diminished, but otherwise his reflexes were normal. (Id. ). After his examination, Dr. Smith stated that he "believe[d] [Plaintiff] would benefit from changing occupations." (Id. at 407).
On July 10, 2015, Plaintiff submitted his letter of resignation to his employer, noting that he was resigning "due to medical issues." (Id. at 800). Plaintiff made his resignation effective thirty days from the date of the letter "[t]o follow the terms of [his] employment agreement and to avoid any penalties." (Id. ). Upon the termination of his employment, Plaintiff submitted to Defendant the claim at issue. (Id. 392-396). Accompanying his claim was a physician statement from Dr. Smith that Plaintiff could not "continue [his] current occupation." (Id. at 207-08).
In response to the claim, Defendant hired a rehabilitation specialist to complete an occupational analysis. (Doc. 38 at 6 ¶ 19; Doc. 39 at 4 ¶ 19). The analysis concluded that Plaintiff's occupation-dentistry-is a light level occupation, which requires frequent reaching, handling, fingering, and feeling, and it requires a high level of finger dexterity-above 89%. (AR a 927).
Defendant also hired Dr. Dan Gerstenblitt to conduct an independent medical examination of Plaintiff. (See id. at 1106). During his physical examination of Plaintiff, Dr. Gerstenblitt noted that Plaintiff had a five out of five strength in his upper and lower extremities and he was able to make full grips bilaterally. (Id. at 1109). Dr. Gerstenblitt also noted that Plaintiff's neck range of motion was "markedly reduced." (Id. at 1110). After reviewing Plaintiff's medical records and conducting a physical examination, Dr. Gerstenblitt stated that there were no objective findings to support Plaintiff's pain complaints other than decreased range of motion of his neck. (Id. ). However, according to Dr. Gerstenblitt, the limited range of motion was not reliable because, in his opinion, Plaintiff was self-limiting. (Id. at 1111, 1112). Dr. Gerstenblitt also opined that Plaintiff's MRI was "extremely unimpressive," that it was "totally consistent with a man of this age range," and that there was nothing in the MRI to "explain [Plaintiff's] symptoms." (Id. ).
As a result, Dr. Gerstenblitt stated that he "sees no reason [Plaintiff] could not continue working other than [his] ... subjective complaints of pain." (Id. ). This conclusion, Dr. Gerstenblitt contended, was supported by the fact that Plaintiff continued to work for three years after the motor vehicle collision. Nevertheless, Dr. Gerstenblitt did acknowledge that if Plaintiff was, in fact, having weakness and numbness in his hands, he could pose a safety risk to his patients. (Id. ).
On March 10, 2016, Defendant denied Plaintiff's claim. (Id. at 169-78). In doing so, Defendant primarily relied on Dr. Gerstenblitt's opinions. (See id. at 173-75). Defendant also referenced the fact that Plaintiff worked for over three years after the collision and noted that there was no objective evidence to explain why he was suddenly unable to work in 2015. (Id. at 175). Two additional factors were important in Defendant's denial: the fact that Plaintiff had not been treated for any complaints between September 2013 and June 2015, when he presented to Dr. Smith with complaints of severe pain; and the fact that Plaintiff did not have a precise explanation for what had changed to cause the increased pain. (Id. ). Plaintiff appealed the denial of his claim through Defendant's internal process. (Id. at 1125).
*1341 On appeal, Plaintiff provided additional evidence. (See id. at 1125-26). In May 2016, Plaintiff underwent a Functional Capacity Evaluation ("FCE"). During the FCE, Michael Yarvi, an occupational therapist, put Plaintiff through a series of tests to measure his physical capabilities as they relate to his ability to complete job tasks. (See generally id. at 1143-1170). The FCE also involved testing for "sincerity of effort." (Id. at 1148). The results indicated that Plaintiff "demonstrated consistent and maximal effort during the [FCE]." (Id. ). The results of the FCE were that Plaintiff's "overall work ability [was] [s]edentary ... with significant limitations regarding use of the right [upper extremity] (dominant hand) to perform work related tasks." (Id. at 1144). It went on to explain that Plaintiff's "reaching and handling" abilities in his right upper extremity were "below functional" and his "endurance to repetitive use" in his shoulder "shows [an] inability to safely perform the essential job demands of a dentist." (Id. ). As such, Mr. Yarvi recommended that Plaintiff "not return to work as a [d]entist" and noted that "[t]here are no noted accommodations that would enable him to modify his required job tasks to successfully perform his work duties." (Id. at 1145).
In addition to the FCE, Plaintiff engaged Dr. David Ross to conduct a Neurophysiologic Pain Profile. (Id. at 1172). This testing involved applying various forms of physical stimulation to the site of the complained-of pain and to a non-painful control site. (Id. at 1173). Before, during, and after the stimulations, the Plaintiff's neurophysiological responses were monitored and documented. (Id. ). Dr. Ross tested Plaintiff's neck first after Plaintiff had simply been laying down for a period of time and second after Plaintiff had been sitting with his neck flexed for fifteen minutes-something he would frequently have to do as a dentist. (Id. ). Dr. Ross stated that the results of the testing were "consistent with a multidimensional pain syndrome with mild myofascial pain and moderate associated neural-biological pain amplifiers." (Id. at 1174). He also noted that Plaintiff's pain complaints and the corresponding, corroborating autonomic responses significantly increased "after a relatively short period of neck flexion." (Id. ). Thus, Dr. Ross opined that if Plaintiff "were asked to maintain the provocative position for more time or repeat that position frequently over an eight-hour work-day, it is probable that the neurological phenomena would substantially increase." (Id. ). Dr. Ross further conducted a physical exam of Plaintiff and noted that he had "a moderate decrease in neck flexion with mild-to-moderate neck extensor tenderness and spasm." (Id. at 1178). Based on his examination of Plaintiff and a review of Plaintiff's medical records and history, Dr. Ross diagnosed Plaintiff with Chronic Pain Syndrome and opined that Plaintiff was "work disabled from performing the material duties of a dentist" and that his disability was permanent. (Id. at 1179, 1182-83).
Next, Plaintiff submitted the "sworn statement" of Dr. Sharfman, who focused on Plaintiff's headaches. (Id. at 1236). During his physical exam of Plaintiff, Dr. Sharfman observed "demonstrated tenderness over the greater occipital notches, the back part of the head," and he found "muscle spasm and decreased range of motion in the cervical spine." (Id. at 1241). Dr. Sharfman also stated that he had no reason to believe that Plaintiff was malingering or exaggerating his headaches. (Id. at 1241-42). Dr. Sharfman further opined that it was not safe for Plaintiff to practice dentistry. (Id. at 1243). He explained that Plaintiff's pain would negatively impact his concentration, mental focus, and memory, and that stress and the posture of a dentist could "[d]efinitely" exacerbate or trigger *1342 one of Plaintiff's headaches. (Id. at 1243-44). Finally, Dr. Sharfman concluded that Plaintiff would not recover from his headaches. (Id. at 1245).
Plaintiff also hired a non-treating physician, Dr. Stephen Wender, to review all of the evidence in this case and give his opinions about Plaintiff's abilities. After a lengthy review of Plaintiff's relevant medical history and documentation, Dr. Wender opined that "without question" Plaintiff was "unable to practice as a dentist." (Id. at 1259). Specifically, Dr. Wender noted that Plaintiff's complaints of numbness and weakness in his right upper extremity, which according to Dr. Wender was supported by his MRIs, created an increased risk of injuring a patient. (Id. ). Dr. Wender also noted that Plaintiff's pain, weakness, and decreased dexterity in his hand would likely get worse "given the neuroanatomic location of his pathology." (Id. ). Dr. Wender further explained why he disagreed with Dr. Gerstenblitt's analysis: because the MRIs supported Plaintiff's complaints, there was no evidence that Plaintiff was self-limiting or malingering, and the FCE-which Dr. Gerstenblitt did not consider-was valid.
Finally, Plaintiff submitted declarations from two dental assistants who worked with him during his previous employment. (Id. at 1262, 1263). Madeline Rivera, who worked with Plaintiff for ten years prior to his resignation, averred that she observed Plaintiff "[get] progressively worse with pain" after the motor vehicle collision. She observed Plaintiff shake his hands because of the pain, complain about headaches, take pain medication, drop dental instruments during lengthy procedures, and ask for assistance when using certain tools. (Id. at 1262). Ms. Rivera had not observed any of these things prior to the collision. (Id. ). Joan Olivar, who worked with Plaintiff for nine years, made similar observations. (Id. ). She noted that she "could see [the pain] in his face" and that Plaintiff would sometimes leave work early because of the pain. (Id. ). Ms. Olivar also observed Plaintiff having difficulty using dental instruments with his right hand, change positions and stretch often, and drop instruments. (Id. ). Finally, Ms. Olivar provided an example of Plaintiff having to stop work suddenly due to pain when using the high-speed drill. (Id. ).[2]
Defendant, in turn, hired an additional physician, Dr. James Butler, to review Plaintiff's claim, including the new evidence provided on appeal. (Id. at 189, 1438). Dr. Butler did not physically examine Plaintiff. Dr. Butler also did not consider the FCE, summarily stating that it had "been deemed invalid." (Id. at 1456). Additionally, despite acknowledging that Dr. Ross's examination "substantiate[s] [Plaintiff's] neurophysiologic pain," and noting that Plaintiff "apparently h[as] muscular pain," he disregarded such evidence by simply stating that "four years post-[motor vehicle accident]" such pain "would not be a normal event." (Id. at 1456).[3]
After reviewing all of the additional evidence submitted, Defendant again denied Plaintiff's claim. (See id. at 185-194). Again, Defendant asserted that Plaintiff had failed to provide objective evidence of his disability, and it relied primarily on the opinions of Dr. Gerstenblitt and Dr. Butler. Plaintiff now appeals Defendant's denial of his claim.
*1343 II. LEGAL FRAMEWORK
In reviewing an ERISA plan administrator's benefits decision, the Eleventh Circuit has set forth the following six-step test:
(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
(5) If there is no conflict, then end the inquiry and affirm the decision.
(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.
Blankenship v. Metro. Life Ins. Co. , 644 F.3d 1350, 1355 (11th Cir. 2011).
Defendant served as the claims review fiduciary and was vested with discretionary authority to interpret the Plan and the insurance policy.[4] (AR 15). Thus, a de novo review is unnecessary, and the Court will begin its analysis with the third step, determining whether Defendant's decision to deny Plaintiff's claim was arbitrary and capricious. Till v. Lincoln Nat'l Life Ins. Co. , 678 F. App'x 805, 808 (11th Cir. 2017). Additionally, it is undisputed that Defendant had at least some level of conflict of interest because it was both the entity that made the "eligibility decision[ ]" and the one that would have to pay any "awarded benefits out of its own funds." Blankenship , 644 F.3d at 1355. Therefore, as part of the arbitrary and capricious review, the Court must examine the severity of the conflict and consider it as a factor in whether there was a reasonable basis for Defendant's benefits decision. Id.
III. ANALYSIS
Defendant's determination that Plaintiff failed to provide sufficient, objective medical evidence[5] of his disability was unreasonable. Although put in more artful terms, Defendant's denial came down to a conclusion that Plaintiff was lying. Such a conclusion is simply unsupported by the evidence.
A. Credibility
As discussed more in-depth below, Plaintiff provided a myriad of objective evidence that he was, in fact, experiencing debilitating pain. Despite this evidence, Defendant still attempts to discredit him-essentially arguing that, while Plaintiff *1344 may have been experiencing pain, it was not severe enough to render him disabled and insinuating that Plaintiff is simply malingering in order to cheat the system. Defendant seems to take issue with the fact that Plaintiff has not presented a neatly-packaged explanation as to why he could no longer work in August 2015 when he had presumably been in pain since the motor vehicle collision in 2012. Relatedly, Defendant argues that there was no triggering event to make Plaintiff disabled immediately prior to filing the claim. First, there is no requirement that Plaintiff suddenly become disabled immediately prior to making a claim under the Policy. Plaintiff must merely be disabled at the time the claim is made and for the following elimination period. As the evidence establishes, Plaintiff suffers from persistent pain that is exacerbated by stress and certain physical exertions-including exertions that are required when working as a dentist. Thus, it is not difficult to understand how Plaintiff's pain gradually worsened and eventually became unbearable as opposed to the pain being triggered by a single, discrete event.
Defendant also takes issue with the fact that Plaintiff did not receive treatment for the year-and-a-half prior to his July 2015 visit with Dr. Smith. Both Dr. Smith and Dr. Sharfman told Plaintiff that he had reached maximum medical improvement, with Dr. Smith indicating that the only other option for treatment was a significant surgery that was not guaranteed to improve Plaintiff's state. It is reasonable that, in the face of two doctors telling him that there was nothing they could do to help absent surgery, Plaintiff waited to go back until his pain became so unbearable that he was willing to consider a severe option.
In a similar vein, Defendant asserts that the fact that Plaintiff worked for three years after the motor vehicle collision and that he gave thirty days' notice of his resignation is proof that he is not disabled. "Although this argument has superficial appeal, many cases have recognized that disability is not disproved by the mere fact that the claimant found a way to continue working." Nieves v. Prudential Ins. Co. of Am. , 233 F.Supp.3d 755, 761 (D. Ariz. 2017) (collecting cases). "A desperate person might force himself to work despite an illness that everyone agreed was totally disabling. Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely." Hawkins v. First Union Corp. Long-Term Disability Plan , 326 F.3d 914, 918 (7th Cir. 2003) (internal citations omitted). As explained at length below, there is objective medical evidence that Plaintiff was experiencing debilitating pain. Plaintiff "should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits" once he stopped working. Id. ; see also Marecek v. BellSouth Telecomms., Inc. , 49 F.3d 702, 706-07 (11th Cir. 1995) (indicating that the Eleventh Circuit does not view attempting to work as a per se waiver of disability benefits).
Indeed, the uncontradicted evidence submitted by his dental assistants supports the conclusion that Plaintiff was likely disabled and practicing dentistry in a potentially unsafe manner prior to finally admitting that he needed to stop. Defendant discredits this evidence because it fails to specify when, precisely, Plaintiff was exhibiting pain, dropping dental tools, and stopping suddenly during procedures. However, at least one of the assistants, Ms. Rivera, averred that from the time of the collision until his resignation, she observed him get "progressively worse with pain." (AR at 1262). Plaintiff's reluctance to resign from his career-which helps explain his efforts to continue working despite *1345 the pain-is also supported by Ms. Rivera, who stated, "When [Plaintiff] had to leave the dental practice, I recall him crying and saying he did not want to stop working. It was clear that he loved his job." (Id. ).
None of Defendant's attempts to discredit Plaintiff are successful. Moreover, Defendant's arguments in this regard do nothing to undermine the objective evidence Plaintiff submitted of his disability.
B. Timing
Before the Court addresses the evidence on the record and the reasonableness of Defendant's decision, it must address Defendant's argument that certain evidence cannot be considered. Specifically, Defendant argues that the additional evidence submitted by Plaintiff during its internal appeal process-i.e., Dr. Ross's testing and the FCE-cannot be considered because the testing was not conducted during the elimination period. Defendant's argument ignores reality. First, Defendant considered this evidence on appeal. Second, the evidence corroborates evidence from the relevant timeframe that Defendant had deemed too subjective. Plaintiff was not suddenly complaining of a completely new ailment on appeal. When Plaintiff initially submitted his claim, he included evidence that he was suffering from the exact pain that was later substantiated by Dr. Ross and the FCE.[6] It is unreasonable to conclude that this later evidence is somehow irrelevant to the question of whether Plaintiff was, in fact, experiencing such pain.
C. Objective Evidence
Defendant asserts that Plaintiff's claim was properly denied because Plaintiff failed to provide sufficient objective evidence to prove he was disabled. Defendant relied almost entirely on its physicians-Drs. Gerstenblitt and Butler. Those doctors opined that Plaintiff was not disabled, and in coming to such an opinion relied almost entirely on Plaintiff's MRIs. Specifically, they opined that the MRIs did not objectively support Plaintiff's complaints of pain. Although Plaintiff's doctors-Dr. Smith and Dr. Wender-disagreed, Defendant was well within its discretion to rely on its' doctors' opinions regarding the MRIs. Nevertheless, even accepting that the MRIs, in and of themselves, were not sufficient to support or explain Plaintiff's complaints of pain, Plaintiff provided additional, objective evidence in support.
As discussed above, Dr. Ross performed a series of tests, which resulted in objective evidence that Plaintiff was, in fact, experiencing severe pain. Even Dr. Butler acknowledged that Dr. Ross "has proven" that Plaintiff was experiencing pain. (AR at 1458). Plaintiff also submitted a comprehensive FCE, which put Plaintiff in work-based physical scenarios and measured the physical limitations Plaintiff was experiencing. The FCE also included multiple tests to determine whether Plaintiff was exhibiting consistent maximal effort-he was-or whether he was malingering-he was not.
Instead of addressing Dr. Ross's test results and the FCE, however, Defendant relied on Dr. Butler, who summarily dismissed both without explanation. Dr. Butler simply stated that "pain is a perception." (Id. at 1456). He also disregarded the FCE by claiming that it had been found to be invalid; however, there is no evidence in the record of such a determination.
*1346 To the contrary, both Dr. Wender and Dr. Ross opined that the FCE was valid, noting the steps taken during the FCE to ensure reliability. (Id. at 1234, 1260).
Defendant similarly disregarded Dr. Sharfman's sworn statement that his physical examination of Plaintiff revealed tenderness and muscle spasms, which could cause Plaintiff's headaches.[7] Again, Defendant relied on Dr. Butler, and again Dr. Butler dismissed the data without a full explanation. Specifically, instead of addressing Dr. Sharfman's findings, Dr. Butler simply notes that it "would not be a normal event" for someone to still have muscular pain four years after a vehicle collision. Notably, Dr. Butler does not state that it was impossible, nor does he discredit Dr. Sharfman's findings.
In an attempt to further dismiss Plaintiff's complaints of headaches, Defendant focuses on one office visit with Dr. Smith where-on that particular day-Plaintiff did not complain of a headache. Nowhere does Plaintiff assert he experienced one, non-stop headache. It was unreasonable for Defendant to hone in on one office visit while ignoring the many others where Plaintiff did complain of a headache.[8]
In addition, every physical examination of Plaintiff where cervical range of motion was tested showed that Plaintiff had decreased range of motion. (Id. at 490, 1020, 1240-41, 1178). In addition, multiple doctors-including Defendant's physician Dr. Gerstenblitt-concluded that there was no evidence that Plaintiff was malingering, a conclusion that was supported by Dr. Ross's testing and the FCE. And yet, Defendant disregards all such evidence and relies on Dr. Gerstenblitt's conclusion that Plaintiff was "self-limiting." Not only did Dr. Gerstenblitt fail to provide an explanation for this conclusion, but he also did not have the benefit of the subsequent testing, which presented objective evidence that Plaintiff was experiencing pain and was giving maximal effort.
Defendant is permitted to deny claims "on the basis of conflicting, reliable evidence," See Oliver v. Coca Cola Co. , 497 F.3d 1181, 1199 (11th Cir. 2007), vacated in part on other grounds , 506 F.3d 1316 (11th Cir. 2007), but that is not what occurred here. Instead, Defendant cherry-picked favorable evidence to rely upon while ignoring the abundance of unfavorable medical evidence. Moreover, Defendant did so by relying on Dr. Butler's flawed peer review. See id. at 1198-99 (noting that a peer review was "flawed" where it contained a "disturbing pattern" of "disregarding [unfavorable] evidence"). Thus, Defendant's decision to deny Plaintiff's claim on the basis that Plaintiff failed to present objective evidence of his disability was arbitrary and capricious. Id.
D. Pain as a Basis for Disability
One theme that serves as an undercurrent in Dr. Gerstenblitt and Dr. Butler's opinions, upon which Defendant relied heavily, is the opinion that pain cannot be the basis of Plaintiff's disability because he will be in pain whether he is working or not. First, the basic premise of this opinion is contradicted by the evidence, which indicates that Plaintiff's pain was exacerbated *1347 by working due to the physical positions required of dentistry. Moreover, there is record evidence indicating that the pain, numbness, and tingling were not only uncomfortable but also caused Plaintiff to drop instruments and made him unable to perform some tasks effectively, including having to abruptly stop during procedures. Additionally, even Dr. Gerstenblitt acknowledged that weakness and numbness in the hands could cause a safety risk to patients. Finally, Dr. Sharfman opined that Plaintiff's headaches made it unsafe for him to continue to practice as a dentist because his concentration, mental focus, and memory were decreased when he was in pain. (AR at 1243). Neither Dr. Gerstenblitt nor Dr. Butler provided any counter to this evidence-they merely made unsubstantiated claims that pain cannot be the basis for restrictions or disability. To the extent Defendant relied on Dr. Gerstenblitt and Dr. Butler in this regard, it was unreasonable.
IV. CONCLUSION
In sum, Defendant's decision to deny Plaintiff's disability claim was unreasonable. Plaintiff provided an abundance of objective medical evidence that he is, and during the relevant timeframe was, disabled under the Policy. Instead of reviewing all of the evidence from a neutral standpoint, Defendant cherry-picked portions of the record to rely on while ignoring other portions. And, often, the portions relied upon by Defendant were the unsupported opinions of Dr. Butler, who also simply disregarded much of the objective evidence. Defendant's behavior suggests that its goal was to find a way to deny Plaintiff's claim. And such behavior indicates that the conflict of interest created by Defendant's financial incentive to deny the claim clouded Defendant's judgment.
Accordingly, it is ORDERED and ADJUDGED as follows:
1. Plaintiff's Motion for Summary Judgment (Doc. 38) is GRANTED .
2. Defendant's Response and Cross Motion for Summary Judgment (Doc. 39) is DENIED .
3. On or before April 10, 2019 , the parties shall confer in a good faith effort to determine the amount of damages Plaintiff is owed. If the parties agree, they shall file a notice, advising the Court of the agreed upon amount. If the parties cannot agree then, on or before April 26, 2019 , Plaintiff shall file a brief regarding his damages. Defendant may then file a response within fourteen days.
DONE and ORDERED in Orlando, Florida on March 27, 2019.

The parties dispute whether the Court can consider the evidence obtained during the pendency of this litigation. Plaintiff argues that this evidence goes to the conflict of interest issue, while Defendant argues that it does not. The additional information was not necessary for the Court's determination, and it was not considered.

Plaintiff also submitted a letter, indicating that there were no performance problems at work other than Plaintiff's physical difficulties. Defendants do not appear to contest this fact.

Dr. Butler also made it abundantly clear that he believed Plaintiff was lying and that his doctors were simply saying what Plaintiff wanted them to say. (See id. at 1456-1457).

Plaintiff does not appear to dispute the fact that Defendant was vested with discretionary authority. (See Doc. 38 at 3 (noting that Defendant was "a plan administrator and fiduciary with discretionary authority").

The parties disagree as to the type of evidence Plaintiff was required to provide. In light of the fact that the Court finds Plaintiff provided objective evidence, the Court need not address this argument.

It is also worth noting that Defendant did not render its decision on Plaintiff's initial claim until over a month after the elimination period had ended. Thus, if Defendant's argument was given credence, Plaintiff would be faced with an impossible situation.

Dr. Sharfman also opined that the MRI supported the type of nerve damage that would contribute to Plaintiff's headaches. But, as discussed above, Defendant had the discretion to disregard such opinions due to the contradictory opinions of Drs. Gerstenblitt and Butler.

Notably, even if Plaintiff's headaches are removed from the equation, he still showed that he was unable to perform as a dentist due to his neck pain and resulting weakness and numbness in his right hand.